UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

PATRICIA HARRIS LEE,                          07 CV 6733 (SM)

                       Plaintiff,

      -v -

SONY BMG MUSIC ENTERTAINMENT, INC, and
BARBARA WARNOCK-MORGAN, Individual

                    Defendants.

------------------------------------------------------------------x


**MEMORANDUM OF LAW IN OPPOSITION
OF DEFENDANT'S MOTION TO DISMISS, OR
<u>ALTERNATIVELY, FOR SUMMARY JUDGMENT</u>**




LEVINE & BLIT, PLLC

***Attorney for Plaintiffs***
Empire State Building
350 Fifth Avenue, Suite 6902
New York, NY 10118
Phone: (212) 967-3000
Fax:    (212) 967-3010

# TABLE OF CONTENTS

PRELIMINARY STATEMENT…………………………………… p.1

STATEMENT OF FACTS    ………………………………………… p.1

ARGUMENT                 ………………………………………… p.2

Point I
          PLAINTIFF'S AMENDED COMPLAINT
          SHOULD NOT  BE DISMISSED    ………………….. p.2

A.    Motion to Dismiss Standard  ………………………………… p.2

        1.   Plaintiff States a Disability
            Discrimination Claim ………………………….. p.3

        2.   Plaintiff States a Race
            Discrimination Claim ………………………… p.7

        3.   Plaintiff Has Sufficiently
            Alleged Extreme and Outrageous Conduct …… p.9

        4.   Leave to Amend Should be Granted ………….. p.9


Point II
          DEFENDANTS ARE NOT ENTITLED TO
          SUMMARY JUDGMENT……………………………. p.9

A.    Motion for Summary Judgment Standard ………………… p.9

B.    Plaintiff Has Raised Triable Issues
    of Material Fact       ………………………………………… p.10


CONCLUSION              ………………………………………… p.10

## TABLE OF AUTHORITIES

Adams v. Rochester General Hosp.,
977 F. Supp. 226, 232 (W.D.N.Y. 1997) ........................................ p.3

Alfano v. Costello,
294 F.3d 365, 374 (2d Cir. 2002) ........................................ p.5

Baird v. Rose,
192 F.3d 462, 471-72 (4th Cir. 1991) ........................................ p.7

Bender v. City of New York,
78 F.3d 787, 790 (2d Cir. 1996). ........................................ p.9

Byrd v. Abate,
964 F. Supp. 140 (S.D.N.Y 1997) ........................................ p.3

Celotex Corp. v. Cartrett,
477 U.S. 317, 323 (1986). ........................................ p.9

Chance v. Armstrong,
143 F.3d 698, 700 n.1 (2d Cir. 1998) ........................................ p.8

Donohue v. Windsor Locks Board of Fire Commissioners,
834 F.2d 54, 58 (1987). ........................................ p.10

Eastway Construction Corp. v. City of New York,
762 F.2d 243, 249 (2d Cir. 1985). ........................................ p.10

Gagliardi v. Village of Pawling,
18 F.3d 188, 191 (2d Cir. 1994) ........................................p.2

Galdieri-Ambrosini v. National Realty & Development Corp.,
136 F.3d 276, 292 (2d Cir.1998). ........................................ p.7

Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,
62 F.3d 69, 72 (2d Cir. 1995) ........................................ p.8

James v. Federal Reserve Bank of New York,
2005 WL 1889859 (E.D.N.Y. Aug. 8, 2005) at *9,
471 F. Supp.2d 226 (E.D.N.Y. 2007). ........................................ p.3

Leopold v. Baccarat, Inc.,
174 F.3d 261, 264 n.1 (2d Cir. 1999) ........................................ p.7

Mescall v. Marra,

49 F. Supp.2d 365, 373 (S.D.N.Y. 1999) ........................................ p.3

Parker v. Columbia Pictures Industries,
204 F.3d 326, 338 (2d Cir. 2000) ........................................ p.4

Pimentel v. Citibank, N.A.,
29 A.D.3d 141, 148; 811 N.Y.S.2d 381, 386 (1st Dep't 2006). ............ p.4

Ramos v. N.Y.C.,
1997 WL 410493 at *3 (S.D.N.Y. 1997) ........................................ p.7

Richardson v. N.Y.S. Dept. of Corr. Serv.,
180 F.3d 426 (2d Cir. 1999). ........................................ p.5

Rodal v. Anesthesia Group of Onondaga,
369 F.3d 113, 117 n.1 (2d Cir. 2004) ........................................ p.3

South Road Associates v. Int'l Bus. Machines Corp.,
216 F.3d 251, 253 (2d Cir. 2000). ................................................ p.2

Stetson v. Nynex Serv. Co.,
995 F.2d 355, 361 (2d Cir. 1993) ........................................ p.6

Swierkiewicz v. Sorema, N.A.,
534 U.S. 506, 507, 122 S. Ct. 992, 995, 152 L. Ed.2d 1 (2002) ............ p.2, 6

Tomka v. The Seiler Corporation,
66 F.3d 1295, 1305 (2d Cir.1995). ........................................ p.5

Zirpel v. Toshiba Am. Info. Sys., Inc.,
111 F.3d 80, 81 (8th Cir. 1997) ........................................ p.3

Statutes and Regulations

Rule 12(b)(6) Fed. R.Civ.P. ........................................ p.1

Rules 56(c) Fed. R. Civ. P. ........................................ p.1

Rule 15(a) Fed. R. Civ. P. ........................................ p.9

29 C.F.R. §1630.2(i). ........................................ p.3

## PRELIMINARY STATEMENT

Plaintiff, Patricia Harris Lee ("Plaintiff" or "Harris Lee"), commenced this civil action against Defendants, Sony BMG Music Entertainment, Inc ("Defendant" or "Sony BMG") and Barbara Warnock-Morgan ("Warnock-Morgan") alleging violations of the Americans With Disabilities Act ("ADA"), 42 U.S.C. §12101, et seq., Title VII of the Civil Rights Act, as codified, ("Title VII"), 42 U.S.C. §2000(e) et seq., the New York State Executive Law, Human Rights Law, ("NYSHRL"), §290 et seq., the Administrative Code of the City of New York, ("NYCHRL"), §8-801 et. seq., and the Civil Rights Act of 1871, 42 U.S.C. §1981.  Plaintiff also alleges a state-law claim for intentional infliction of emotional distress.

After Plaintiff served an Amended Complaint, dated November 29, 2007 ("Complaint"), Defendants' moved, pursuant to Rule 12(b)(6), Fed. R. Civ. P., for an order to dismiss the Amended Complaint for failure to set forth a claim upon which relief can be granted, or alternatively, for summary judgment, pursuant to Rule 56(c), Fed. R. Civ. P.

This Memorandum of Law is respectfully submitted on behalf of Plaintiff, Patricia Harris Lee, in opposition to Defendant's Motion to Dismiss, or alternatively, for Summary Judgment.

## STATEMENT OF FACTS

The relevant facts opposing Defendants Motion are set forth in the Declaration of Plaintiff Harris Lee ("HL Decl."), the Amended Complaint, and throughout the body of this Memorandum.  The Court is respectfully referred to these documents for a full recitation of the facts.

## ARGUMENT

## POINT 1

## PLAINTIFF'S AMENDED COMPLAINT SHOULD NOT BE DISMISSED

### A.    STANDARD ON A MOTION TO DISMISS

To survive a motion for dismissal under Rule 12(b)(6), [a] complaint must allege facts that, if true, would create a judicially cognizable cause of action." South Road Associates v. Int'l Bus. Machines Corp., 216 F.3d 251, 253 (2d Cir. 2000). In its consideration of a motion to dismiss, a court must "construe any well-pleaded factual allegations in the complaint in favor of the plaintiff and dismiss the complaint only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Gagliardi v. Village of Pawling, 18 F.3d 188, 191 (2d Cir. 1994). Under the liberal pleading standards articulated in the Federal Rules, a complaint must "include only a short and plain statement of the claim showing that the pleader is entitled to relief[,]" (Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 507, 122 S. Ct. 992, 995, 152 L. Ed.2d 1 (2002), and is designed merely to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Id. Accordingly, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Id. As set forth below, plaintiff's claims should not be dismissed as she has sufficiently alleged a set of facts which put Defendant on notice of the nature of her claims, and which, if true, entitles her to relief.

1.    PLAINTIFF STATES A DISABILITY DISCRIMINATION CLAIM

In order to establish a disability discrimination claim, a plaintiff must allege that (1) her employer is subject to the ADA; (2) she suffers a disability within the meaning of the ADA; (3) she is otherwise qualified to perform the essential functions of the position, with or without a reasonable accommodation; and (4) she suffered an adverse employment action because of her disability. *See* James v. Federal Reserve Bank of New York, 2005 WL 1889859 (E.D.N.Y. Aug. 8, 2005) at *9, adhered to on reconsideration, 471 F. Supp.2d 226 (E.D.N.Y. 2007).  State disability discrimination claims are governed by the same legal standards as federal claims.  Rodal v. Anesthesia Group of Onondaga, 369 F.3d 113, 117 n.1 (2d Cir. 2004).

Harris Lee alleges that she suffers from severe reactive anxiety disorder, post traumatic stress disorder, and depression. (HL Decl. ¶13).  These are all psychological disorders which satisfy the regulatory definition of a disability.  29 C.F.R. §1630.2(i). *See, e.g.* Adams v. Rochester General Hosp., 977 F. Supp. 226, 232 (W.D.N.Y. 1997)(depression qualifies as mental impairment); Mescall v. Marra, 49 F. Supp.2d 365, 373 (S.D.N.Y. 1999) (parties do not dispute that depression, panic attacks and exhibiting dermatologic symptoms associated with stress constituted a "mental impairment" for purposes of the ADA).  As a result of her psychological disorders, Harris Lee suffered from symptoms including but not limited to sleep difficulty, decreased appetite, loose stools, reduced ability to concentrate, feelings of depression and back pain, and she also became non-responsive to the medical treatments she was receiving.  (HL Decl. ¶14, 15).

Defendants contend that the plaintiff fails to state a claim for a disability within the meaning of the federal and state statutes by maintaining that "SONY BMG's third-

3

party insurer concluded that all of her injuries were psychosomatic or stress related, which determination is not subject to review in this proceeding." This argument is without merit, as it should be noted that Harris Lee has since filed an appeal challenging the insurer's conclusion. (HL Decl., Exhibit A).

Harris Lee has also sufficiently pled enough facts which establish that "she is otherwise qualified to perform the essential functions of the position, with or without a reasonable accommodation." Here, plaintiff's treating physician informed defendants of her medical condition and urged defendant to physically separate Harris Lee and Warnock Morgan because he was concerned over their close physical proximity. The treating physician then stated he would release plaintiff to go back to work, under doctor supervision, if the matter could be quickly resolved. (HL Decl. ¶19). Plaintiff has also alleged that, in spite of the assurances made by defendants to her physician, the defendants failed to take measures to accommodate her. (HL Decl. ¶20-22). Accordingly, Harris Lee has sustained her burden and sufficiently alleged facts which establish that she proposed a reasonable accommodation and that the defendant refused to make such accommodation. Pimentel v. Citibank, N.A., 29 A.D.3d 141, 148; 811 N.Y.S.2d 381, 386 (1st Dep't 2006).

Inferences of disability discrimination can readily be made from Harris Lee's factual allegations. Sony BMG neglected its responsibility to reasonably investigate plaintiff's requests for accommodation and determine its feasibility. She was also readily ignored by the human resources department, as they failed follow up with any of her concerns. (HLD ¶20, 24, 25). See e.g. Parker v. Columbia Pictures Industries, 204 F.3d 326, 338 (2d Cir. 2000) (The employer has the responsibility to investigate an

employee's request for accommodation and determine its feasibility. An employer who fails to do so, and instead terminates the employee based on exhaustion of leave, has discriminated because of disability within the meaning of the [law]). *Id.*

Defendants final contention that plaintiff fails to allege she suffered an adverse employment action as a result of her disability is ludicrous. Harris Lee has sufficiently alleged facts which illustrate that she was subject to a hostile work environment, constructively terminated from her employment, and retaliated against.

Hostile work environment claims are set forth when a plaintiff has alleged that an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment. Tomka v. The Seiler Corporation, 66 F.3d 1295, 1305 (2d Cir.1995). A hostile work environment exists "when the workplace is permeated with 'discriminatory intimidation, ridicule and insult,'...that it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment." *Id.*

In order to evaluate any hostile work environment claim, it is critical to consider the totality of the circumstances, which includes all of the facts alleged, so as to obtain a realistic view of the work environment. Richardson v. N.Y.S. Dept. of Corr. Serv., 180 F.3d 426 (2d Cir. 1999). In some instances, a single act can create a hostile work environment- "if, by itself, it can and does work a transformation of the plaintiff's workplace." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002).

Here, the March 31, 2006 incident, whereby Warnock-Morgan caused Harris Lee to sustain the alleged physical and psychological injuries is, in and of itself, sufficient to establish a case for hostile work environment. A single episode of assault has been found

to sufficiently alter the conditions of the victim's environment and clearly creates an abusive work environment for the purposes of Title VII liability. Torres, 116 F.3d at 631.

Even assuming, *arguendo*, the March 31, 2006 incident is not deemed sufficiently "severe" to establish the existence of a hostile work environment, the trier of fact could still conclude that Harris Lee was subjected to a hostile work environment based upon defendant's repeated and blatant disregard to address Harris Lee's concerns regarding her disability and/or accommodations thereto, her work environment, and retaliation. (HLD ¶ 16-27).

Plaintiff has also set forth enough evidence to demonstrate that she was constructively terminated from her employment. Defendants argument notably fails to address the fact that plaintiff was forced to continue working in close proximity to her attacker. The facts alleged by Harris Lee can sufficiently to permit a rational trier of fact to infer that the employer deliberately created working conditions that were 'so difficult or unpleasant that a reasonable person in the employee's shoes could have felt compelled to resign." Stetson v. Nynex Serv. Co., 995 F.2d 355, 361 (2d Cir. 1993).

Plaintiff has also sufficiently alleged a claim for retaliation. It should be again noted that, for the purposes of a motion to dismiss, a plaintiff is not required to plead all aspects of a prima facie case of retaliation, but rather need only plead facts which provide the defendant with "fair notice of what plaintiff's claim is, and the grounds on which it rests." Swirekiewicz, 122 S.Ct. at 992.

Retaliation under Title VII occurs when an employer takes an adverse action against a covered individual because he or she engaged in a protected activity. Title VII, §701 et seq., 42 U.S.C.A. §2000e et seq.; ADA, §2 et seq., 42 U.S.C.A. §12101 et seq.

An ADA retaliation claim is to be analyzed as a Title VII retaliation claim. <u>Baird v. Rose,</u> 192 F.3d 462, 471-72 (4th Cir. 1991).

In order for an employee's complaints to constitute a protected activity, the employer must be put on actual or constructive notice that the employee believes that discrimination is occurring. It is also not necessary that the employee specify that she is being discriminated against, or use any particular language. *See* <u>Ramos v. N.Y.C.</u>, 1997 WL 410493 at *3 (S.D.N.Y. 1997). There are no magic words that must be used when complaining for it to be a protected activity. Id. The employer does not have to know that the complaint was a discrimination complaint, so long as the employer could have understood that the plaintiff's opposition was directed at conduct prohibited by Title VII." <u>Galdieri-Ambrosini v. National Realty & Development Corp.</u>, 136 F.3d 276, 292 (2d Cir.1998).

Here, Harris Lee gave defendants actual notice that she was concerned about being retaliated against after filing a complaint against Warnock-Morgan and/or seeking an investigation into the matter. (HL Decl. ¶25). Plaintiff has also sufficiently alleged facts which qualify as adverse changes in the terms and conditions of her employment, including but not limited to her constructive termination.

2.    <u>PLAINTIFF HAS STATED A CLAIM FOR RACE DISCRIMINATION</u>

Title VII prohibits discrimination in employment on the basis of race. NYSHRL and NYCHRL "are analyzed identically to claims under Title VII." <u>Leopold v. Baccarat, Inc.</u>, 174 F.3d 261, 264 n.1 (2d Cir. 1999). As set forth below, Harris Lee has alleged the following facts to confer a cognizable claim for race discrimination.

Here, plaintiff alleges that, without any provocation on her part, Warnock-Morgan singled her out at the March 30, 2006 meeting and began to attack her. Harris Lee was the only non-Caucasian staff member at that meeting, and despite the fact that it was the other staff members who were badgering Warnock-Morgan, plaintiff bore the brunt of her wrath. (HL Decl ¶7-9).

Harris Lee also alleges that defendants have a zero-tolerance policy against violence in the workplace and that such an act usually results in the immediate termination of the attacker. (HL Decl. ¶29). However, this policy was not applied to Warnock-Morgan, who is Caucasian, despite plaintiff's numerous requests that defendants pursue remedial measures and redress the March 31, 2006 incident. (HL Decl. ¶27). Plaintiff alleges that defendants' repeated refusal to respond and/or address her concerns was also, at least in part, due to her race. (HL Decl. ¶28).

Finally, the plaintiff has alleged that Cigna, in renderings its conclusion that plaintiff's MRI of June 28, 2006 did not reveal any abnormalities, failed to take notice of the radiologist's recommendation that a CT scan may be more appropriate because plaintiff's hair extensions "significantly limited" the images of the upper cervical levels. (Exhibit A, p.6).

Since the Court "may consider facts set forth in exhibits attached as part of the complaint," Chance v. Armstrong, 143 F.3d 698, 700 n.1 (2d Cir. 1998), as well as "any statements or documents incorporated in it by reference." Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995), the dismissal of plaintiff's race discrimination claims is not appropriate.

### 3. PLAINTIFF HAS SUFFICIENTLY ALLEGED EXTREME AND OUTRAGEOUS CONDUCT

In order to sustain a claim for intentional infliction of emotional distress, a plaintiff must demonstrate: (1) extreme and outrageous conduct; (2) an intent to cause severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996).

Harris Lee has sufficiently alleged facts which illustrate that the conduct she was subject to goes beyond all possible bounds of decency. The fact that Warnock-Morgan asked her not to call the authorities and was fearful that plaintiff might file assault charges against her is illustrative of such indecency. (HL Decl. ¶12)

### 4. LEAVE TO AMEND SHOULD BE GRANTED

In the event that the Court finds that plaintiff failed to state a cause of action for which relief could be granted, plaintiff requests leave to amend its complaint. Rule 15(a) of the Fed. R. Civ. Pro., provides that leave to amend a pleading "shall be freely given when justice so requires."

<div align="center">

**POINT II**

**DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT**

</div>

### A. STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forewith" if it is shown that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Cartrett, 477 U.S. 317, 323 (1986). If the plaintiff has adduced sufficient facts to substantiate the elements of his claim, summary judgment is inappropriate. *Id.* In determining whether a genuine issue of material fact has been

raised, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. Therefore, not only must there be no issue as to the evidentiary facts, but there must also be no controversy regarding the inferences to be drawn from them. It should be remembered that the Second Circuit regards summary judgment as a drastic remedy because, if granted, it prevents a party's right to present his or her case to the jury. Eastway Construction Corp. v. City of New York, 762 F.2d 243, 249 (2d Cir. 1985). Summary judgment must be used selectively to avoid trial by affidavit. Donohue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 58 (1987).

B.      PLAINTIFF HAS RAISED TRIABLE ISSUES OF MATERIAL FACT

It is clear that by comparing the Defendants and Plaintiff's respective Local Rule 56.1 Statements that there are numerous material facts in dispute. The record, along with all the reasonable inferences drawn in Harris Lee's favor, clearly precludes summary judgment on Harris Lee's claims of discrimination, hostile work environment, and retaliation.

Fatal to defendants contention that the plaintiff has not raised a triable issue of material fact on any of her claims, is plaintiff's allegation that she has appealed the denial of her disability claims. Her appeal, in and of itself, along with the inferences to be drawn in her favor creates a genuine issue as to those evidentiary facts upon which defendant relies in moving for summary judgment on all her claims.

## CONCLUSION

For all the foregoing reasons, defendants motion should be denied in all respects and, in the event the Court finds that plaintiff failed to state a cause of action for which relief could be granted, plaintiff requests leave to amend its complaint.

Dated: New York, New York
      March 6, 2008

LEVINE & BLIT, PLLC

_____
MATTHEW J. BLIT (MJB 4145)

*Attorney for Plaintiffs*
Empire State Building
350 Fifth Avenue, Suite 6902
New York, NY 10118
Phone: (212) 967-3000
Fax:    (212) 967-3010

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

PATRICIA HARRIS LEE,                                          07 CV 6733 (SM)

                              Plaintiff,            **DECLARATION OF**
                                                    **PATRICIA HARRIS LEE**

         -v -


SONY BMG MUSIC ENTERTAINMENT, INC, and
BARBARA WARNOCK-MORGAN, Individual


                              Defendants.
-------------------------------------------------------------------x

**PATRICIA HARRIS LEE, declares as follows:**

1.  I am an African-American woman and the above-named plaintiff in this action.


2.  I began my sixteen (16) year employment tenure with Sony BMG Music
    Entertainment, Inc. ("Sony BMG") and its predecessor in September 1991.


3.  I most recently served as an Associate Director of Advertising Management in the
    Advertising and Creative Services Department. In this position, I was under the
    immediate supervision of Defendant Barbara Warnock-Morgan ("Warnock-
    Morgan").


4.  Warnock-Morgan is a Senior Director at Sony BMG and a Caucasian woman.


5.  Throughout my employment tenure at Sony BMG, my performance evaluations
    have been consistently noted as outstanding and satisfactory.


6.  On March 30, 2006, I attended a management staff meeting in which rumors of a
    departmental merger, possible lay-offs, and reconstruction concerns were being
    addressed.

7. At this meeting, Warnock-Morgan became extremely angry, confrontational and hostile when other staff members began to badger her with questions regarding their employment. All other staff members at this meeting were Caucasian.

8. Warnock-Morgan at the meeting began to yell and curse at me. I sat speechless and shocked. Along with other staff members, I politely asked Warnock-Morgan to compose herself so that the meeting could continue.

9. On March 31, 2006 Warnock-Morgan singled me out because of my race.

10. On March 31, 2006, Warnock-Morgan baselessly accused me of orchestrating the March 30th meeting in her absence so as to undermine her management decisions. She also accused me of not being sensitive to the fact that she recently underwent a D&C as a result of a miscarriage. Warnock-Morgan also said that she hoped I would suffer two miscarriages, and that she hoped that I get to watch my fucking babies get sucked out of me, and then see if she cared.

11. While she was yelling and verbally attacking me with the above-mentioned statements, Warnock-Morgan charged up to me so that we were face to face and thrusted her hands in front of my face. As a result of this, I was physically backed up against the wall. She was shaking out of anger and her hands were flailing. I grasped her wrists to keep her from hitting me and pleaded with her to stop and calm down. Warnock-Morgan has a significant height and weight advantage over me and I felt threatened by her aggressive behavior.

12. Minutes after the above-mentioned incident occurred, Warnock-Morgan left an apologetic message on my answering machine and blamed her physical assault on me on "ware-wolf" conditions she cannot control. Fearful that I would charge her with an assault, Warnock-Morgan asked me to not call the authorities, or tell the "guys with big nets" to come and get her.

13. After the March 31, 2006 incident, I suffered physical and psychological injuries, including but not limited to: traumatic cervical, thoracic and lumbosacral pain syndrome with spasm, severe reactive anxiety disorder, post traumatic stress disorder, and depression.

14. The symptoms related to my psychological injuries are medically documented and include sleep difficulty, decreased appetite, loose stools, reduced ability to concentrate, feelings of depression and back pain.

15. I became non-responsive to the medical treatments I was receiving after the March 31, 2006 incident.

16. On April 3, 2006 I reported the March 31, 2006 incident to Kathleen Kelley ("Kelley") in the Human Resources Department ("Sony HR"). Kelley is a Caucasian female.

17. While I was at the above-mentioned meeting, I informed Sony HR that I no longer desired to work with Warnock-Morgan and asked Kelley if she knew what was going on with other departments and/or the possibility of being transferred or reassigned.

18. After this meeting, I sent weekly emails to Kelley expressing my concerns, fears, and displeasure at working hand-in-hand on a daily basis with Warnock-Morgan.

19. On April 14, 2006, Dr. Bassel, who was my treating physician, notified Sony HR and a nurse practitioner of the seriousness of my medical condition. At this time, Dr. Bassel urged Sony HR to physically separate me from Warnock-Morgan because of his concern over our close physical proximity. Dr. Bassel then stated that he would release me to go back to work, under doctor supervision, if the matter at work could be quickly resolved. Sony HR assured Dr. Bassel that Sony BMG would take action to safeguard my physical and emotional well-being.

20. Despite Sony BMG's above-mentioned assurances, they failed to take any action to accommodate my medical condition.

21. After the March 31, 2006 incident, I was forced to continue working in the same capacity and under the direct supervision of Warnock-Morgan.

22. At one point, Kelley told me that I needed to endure through my work assignments with Warnock-Morgan, make myself more readily accessible to her, and to make sure that I report my comings and goings to her.

23. On April 17, 2006 I again reported the incident to Kelley and Dan Alcock in the Human Resources Department ("Sony HR"). Kelley and Alcock are also both Caucasian. Warnock Morgan also attended this meeting. I again informed Sony HR of my concerns at working hand-in-hand on a daily basis with Warnock-Morgan.

24. On April 19, 2006 I sent Kelley another email asking her for recommendations and/or options of how Sony BMG could best accommodate my medical condition.

25. Sony HR repeatedly failed to respond to any communication I sent them and showed an indifference to my concerns of being retaliated against.

26. Sony HR repeatedly ignored my repeated requests that they follow up with me regarding their investigation into the March 31, 2006 incident and provide me with a copy of their investigative reports.

27. Sony HR repeatedly ignored my repeated request that they pursue and redress the March 31, 2006 incident. I also inquired about what remedial measures, if any, Mr. Owett would take against Warnock-Morgan.

28. Sony HR's repeated pattern of ignoring me was based upon my race.

29. Sony BMG has a zero-tolerance policy against violence in the workplace and such acts usually result in the immediate termination of the attacker. Sony BMG failed to apply this policy against Warnock-Morgan because she is Caucasian.

30. On May 30, 2006, after approximately two months of working in a hostile work environment and having my concerns go ignored, I took a medical leave of absence based upon the advice of my physician.

31. I filed a claim for disability benefits with Sony BMG's disability carrier, CIGNA Life Insurance Company of New York ("CIGNA"). I have appealed their denial of my disability claims three times. [1]

**Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct. Executed at New York, New York on this ____ date of March 2008.**

**PATRICIA HARRIS LEE**

---

[1] The April 24, 2007 appeal letter is annexed hereto as Exhibit "A."

# "EXHIBIT A"

LAW OFFICES

# SAMUEL F. BARNUM
ATTORNEY

4302 REDWOOD HIGHWAY
SUITE 100
SAN RAFAEL, CALIFORNIA 94903
email: sambarnum@earthlink.net

TELEPHONE
415.492.9800

FACSIMILE
415.492.9808

April 24, 2007

*(By Facsimile and U.S. Mail)*

Angela Flaherty Miller
Senior Claim Manager
Routing P-250
CIGNA Group Insurance
P.O Box 22325
Pittsburgh, PA 15222-0325

> Re:  Claimant:  Patricia Harris-Lee
> Plan No..:  SHY 0800501
> Employer:  Bertelmann, Inc.
> Administrator:  Life Insurance Company of North America (LINA)

Dear Ms. Miller:

This letter and the enclosed documents comprise the request for review that I am submitting on behalf of Patricia Harris-Lee (hereafter Patricia).

Ms. Lori Ann Dreyer's letter of November 2, 2006 conveyed CIGNA's decision to affirm the initial denial of Patricia's claim for Short Term Disability benefits. This letter requests a review of CIGNA's November decision

Ms. Dreyer's letter states that the request for review must be sent within 180 days of the date on which Patricia received that letter. Given receipt of the letter on November 9th, the request for review must be submitted by May 9, 2007. Accordingly, this request is made within the 180-day time limitation. Cigna should be mindful that this submission could not be made until I had received the various documents that Patricia and I had requested from Cigna. I received the STD claim file on February 12th and both the STD plan and LTD policy on March 9th.

## THE INITIAL CLAIM DENIAL

Cigna denied Patricia's STD claim by a letter dated June 30, 2006 and signed by Deidra Petrillo. According to Ms. Petrillo, Cigna reviewed medical records concerning the diagnosis and treatment Patricia received for an injury that occurred at work. Ms. Petrillo states that the information provided by Dr. Bassel and Dr. Thornton "confirm the diagnosis of back pain and

Angela Flaherty Miller
Claimant: Patricia Harris-Lee
April 24, 2007
Page 2

spasms and you are receiving the appropriate care for this diagnosis . . . ."   Nevertheless, Ms.
Petrillo concluded that the medical evidence "does not support an impairment from performing
your occupation."

Ms. Petrillo also stated that Cigna reviewed information received from Dr. Paley-Galst to
whom Patricia was referred for a psychological consultation.  Ms. Petrillo acknowledges that Dr.
Paley-Galst saw Patricia on four occasions between April 20, 2006 and June 1, 2006 "for
posttraumatic stress disorder due to a reported work incident."  As summarized by Ms. Petrillo,
Dr. Paley-Galst reported that Patricia was complaining of difficulty in concentrating at work and
stated that she did not feel safe there.

Ms. Petrillo concluded that the information from Dr. Paley-Galst confirmed treatment
for post-traumatic stress disorder.  However, Cigna further concluded that this evidence did not
establish a disability.  In support of this conclusion, Ms. Petrillo makes several assertions.  First,
Dr. Paley-Galst advised in June 2006 that Patricia was "on no medication."  Second, Patricia
worked until May 26, 2006 despite the posttraumatic stress disorder.  Finally, Patricia
"discontinued psychotherapy" with Dr. Paley-Galst as of June 1, 2006.

Ms. Petrillo stated that the denial of the claim was based on a review of the medical
information by "our nurse case manager and associated medical director."

Ms. Petrillo informed Patricia of her right to submit an appeal and that such an appeal
must be filed within 180 days.  However, she erroneously informed Patricia that the appeal must
be directed to the New Jersey Department of Labor.

<u>THE AUGUST APPEAL</u>

Patricia appealed Cigna's denial of her STD claim in a letter dated August 4, 2006.
Relying on Cigna's erroneous representation, she directed the appeal to the New Jersey
Department of Labor.  That state agency, of course, has no jurisdiction over the subject STD
claim, and Patricia was so informed by that agency in its letter of August 15, 2006.

Patricia's letter of August 4 was sent to the Disability Appeals Team and was rightly
treated as a timely appeal.  The letter of appeal dated August 4 was supplemented by another
letter dated August 15, 2006.

Patricia's appeal included additional supporting information from Dr. Jaff and Dr.
Bassel, D.C.  She also sent information regarding psychological counseling that she was getting
from Michele Burrell, LCSW.  Patricia' appeal also addressed specific points that were the basis
for Cigna's denial.

First, she addressed Cigna's claim that she had "discontinued" her treatment with Dr.
Paley-Galst.  She explained that she went to Dr. Paley-Galst on Dr. Bassel's suggestion.  One of
Patricia's concerns was the cost involved.  Patricia would be personally responsible for the cost

Angela Flaherty Miller
Claimant: Patricia Harris-Lee
April 24, 2007
Page 3

of the consultations because Dr. Paley-Galst is not in her group health plan's network. As Patricia explained, she discussed her concerns with Dr. Bassel, but agreed to see Dr. Paley-Galst because of Dr. Bassel's urging that the visits would be minimum and Dr. Paley-Galst would provide her with coping mechanisms for the continuing stressful situation at work. It was agreed that Dr. Bassel would remain in charge of her care and treatment.

Patricia also explained that Dr. Paley-Galst initially wanted to meet with her once a week because of her emotional and psychological state. Patricia had to decline due to financial constraints but agreed to meet twice a month. Over the period that Patricia saw Dr. Paley-Galst, she continued to deal with emotional aftermath of the physical assault that occurred at the end of March. She continued to express these to Dr. Paley-Galst.

Patricia also explained to Cigna that at the meeting on June 1, she told Dr. Paley-Galst that due the financial burden, she needed to find someone within the network in order to afford continued treatment.

Patricia also addressed Cigna's erroneous conclusion that she was not taking any medications for the post-traumatic stress disorder. Patricia informed Cigna that she had asked Dr. Thornton, her primary care physician, for a prescription for the pain and tension that she was experiencing. She also explained that she had not sought any medication before then because Dr. Bassel and she had decided to try a recovery that did not involve the use of drugs.

Dr. Thornton prescribed two drugs: Carisoprodaol, 350 mg, and Naproxen, 500 mg. Both had side effects. For Carisoprodaol, those include drowsiness, dizziness, weakness, agitation, nausea, vomiting and headaches. For Naproxen, they include upset stomach, drowsiness and dizziness. Patricia explained that she took those medications on a daily basis to help her both emotionally and physically. As Patricia pointed out, she had told Cigna about those prescriptions on the STD claim form that she sent to Cigna in June.

Finally, Patricia explained why she remained at work until May 30, 2006. Dr. Bassel had urged the Human Resources Department at SONY BMG to physically separate Patricia from her immediate supervisor, the person who had attacked her. Despite his concerns over her remaining in close physical proximity to her immediate supervisor, Dr. Bassel was assured that SONY BMG would take action to safeguard Patricia's physical and emotional well-being. SONY BMG also said that the March incident would be investigated and handled accordingly.

Patricia relied on her employer's assurances that the matter would be handled and that she would be protected. She also felt obligated to her staff and wanted to co-operate with the investigation by the Human Resources Department. She wanted to support the young managers in her department, who were unsettled by a large number of layoffs that had occurred in January, 2006.

Despite her employer's assurances, the work environment did not improve but instead became, in Patricia's words, "dismissive, grossly neglectful, hostile and non-responsive to my

Angela Flaherty Miller
Claimant: Patricia Harris-Lee
April 24, 2007
Page 4

health and professional needs." Throughout the period from April 3 to May 26, Dr. Bassel had
been monitoring her condition through weekly visits. Patricia's decision to leave work at the
end of May was based on Dr. Bassel's "strong recommendation" that she take a medical leave of
absence immediately. Patricia noted that Dr. Paley-Galst had also recommended that she
remove herself from the work environment for the sake of a full medical recovery.

## CIGNA'S DECISION OF NOVEMBER 2

Cigna denied Patricia' initial appeal by letter dated November 2, 2006 and signed by Ms.
Lori Ann Dreyer.

Ms. Dreyer acknowledged that Cigna received information submitted by Patricia
concerning her continuing treatment by Dr. Jaff, Dr. Bassel, and Michele Burrell, as well as
information regarding the MRI of her cervical spine, nerve conduction studies and notes on her
physical therapy. Ms. Dreyer states that Patricia's file was reviewed by a "Behavioral Health
Specialist" in order to "ensure that the medical evidence was interpreted correctly." Ms. Dreyer
states that the "Behavioral Health Specialist" spoke to Dr. Paley-Galst and Ms. Burrell
concerning the diagnosis of post-traumatic stress disorder. On the basis of these actions, Cigna
concludes that "the medical information on file does not support a functional impairment."

As to the diagnosis of post-traumatic stress disorder, there were no indications of
"objective factors of impairment." According to Cigna, the medical information does not
indicate either the "severity, intensity or duration of your symptoms" or "how they were
affecting your work." Cigna says there was no "mental status exam" to assess "the reported
cognitive deficit." Dr. Galst and Ms. Burrell did not explain how Patricia's "self-reported
symptoms" caused a "functional impairment."

As to Patricia's back pain, Cigna found that the MRI did not reveal any abnormalities and
that the nerve conduction study was within normal limits. Although the office notes from Dr.
Jaff show "traumatic cervical, thoracic and lumbosacral pain syndrome with spasm," those
findings did not show "significant deficits that would preclude sedentary work." The physical
therapy evaluation contained no findings that establish a functional impairment.

As explained next, Cigna's evaluation of the medical evidence is deficient in material
respects and its denial of STD benefits was erroneous.

## THE BACK INJURY

Cigna relies on an office note from Dr. Jaff dated June 30, 2006, which, in its view, fails
to reveal any "significant deficits that would preclude sedentary work." Cigna ignores Dr. Jaff's

Angela Flaherty Miller
Claimant: Patricia Harris-Lee
April 24, 2007
Page 5

letter of July 17, 2006 in support of Patricia's appeal.[1] Dr. Jaff reported that his physical examination "revealed soft tissue restrictions and muscle spasms that severely reduce her mobility." He found that the symptoms "could signal neurological or circulatory dysfunction." He found that Patricia's symptoms "appear related to poor soft tissue and muscle mobility consistent with acute inflammation and traumatic injury."

He also identified significant functional impairment: "Presently, her ability to sit, stand, and walk are limited to periods of less than 20 minutes, and she cannot lift more than 20 pounds or carry more than 15 pounds for longer than 10 minutes at a time." This assessment alone reveals a disability that renders Patricia unable to perform the "material duties" of her job as Associate Director or any other "sedentary work" for that matter. But that is not Dr. Jaff's only finding.

Dr. Jaff also concluded that Patricia's "current level of pain alone is sufficient cause for short term disability." Dr. Jaff believed that Patricia's complaints of pain were consistent with his findings of his physical examination, requiring a prescription for Soma. He states: "At this time, I do not feel she is capable of performing her daily work duties since pain and muscle spasm interfere with all her activities."

Dr. Jaff's letter is significant for two other reasons. Dr. Jaff observes that since his field of specialization is physical medicine and rehabilitation, it is "an appropriate part of my evaluation, assessment and plan to consider emotional and mental aspects of any patient's situation." Dr. Jaff concludes that Patricia has sustained "mental/ emotional injuries" because she "has been affected by this incident at work, and physically fears a colleague who is presently in her work environment."

Dr. Jaff actually understated the work situation because the physical altercation was not with just a "colleague" but with Patricia's immediate supervisor, who, by virtue of that position, posed a continuing threat. While Dr. Jaff did not believe that Patricia's resulting fear over her physical safety by itself was a disability, he nevertheless believed that it "remains a factor in this case." Consequently, Dr. Jaff saw "a real medical need for psychologic or psychiatric care as part of comprehensive treatment of all of Ms. Harris-Lee's injuries."

Finally, Dr. Jaff identified yet another factor to be considered in assessing Patricia's medical condition, the debilitating effect of her pain medication. That medication, Soma, "is sedating and further impairs her functional level." Patricia had also informed Cigna that her medications were having adverse side effects hindering her ability to concentrate. On the claim form dated June 14, 2006, she reported that the Carisoprodol and Naproxen, prescribed by he primary care physician, Dr. Thornton, were hindering her "ability to focus." As noted above, she discussed these side effects again in her letter of appeal dated August 4, 2006.

---

[1] Dr. Jaff directed his to the New Jersey Department of Labor and not to Cigna only because of Cigna's erroneous instruction to Patricia that her appeal must be so addressed.

Angela Flaherty Miller
Claimant: Patricia Harris-Lee
April 24, 2007
Page 6

Cigna relies on the physical therapy evaluation dated July 28, 2006, which it reads as not supporting a "no-work" status. While that report notes increased range of motion in certain respects and a "mild" decrease in pain, it also recommends therapy session "2-3" times a week , with an estimated duration of 6 weeks. Cigna ignores the evaluation three weeks earlier, dated July 7, 2006, which noted Patricia was unable to tolerate several strength and mobility exercises. In any event, the diagnosis was made by Dr. Jaff, not the physical therapist. As noted in his letter of July 17, 2006, Dr. Jaff prescribed the physical therapy "to provide analgesia and restore muscle balance, strength and endurance."

Cigna's only comment about the MRI of June 28, 2006 is that "did not reveal any abnormalities." In fact, the MRI is significant in three respects, none of which was considered by Cigna.

First, the MRI revealed " at C4-C5, . . . a small disc bulge present with mild mass effect in the thecal sac." The MRI also showed "at C3-C4, a small disc bulge suggested . . . ." As to the "suggested" bulge at C3-C4, "visualization is limited due to marked metallic artifact." The "metallic artifact" referred to "the patient's hair extensions which somewhat limit visualization of upper cervical levels." Consequently, the MRI revealed "disc bulges at the upper cervical levels" consistent with Patricia's symptoms and complaints and the diagnosis by Dr. Jaff.

Second, the radiologist who conducted the MRI emphasizes that the images of the "upper cervical levels " are "significantly limited" because of Patricia's hair extensions. He says, "If clinically indicated for better evaluation, a CT scan may be appropriate."

The MRI also detected "straightening of the normal cervical lordosis." He concludes that this straightening "may be secondary to pain, muscle spasm or patient positioning."

Cigna's conclusion that the MRI did not reveal any abnormalities" is a complete misinterpretation that disregards the plain import of the report. Moreover, the radiologist openly acknowledged that the MRI was inconclusive as to the upper cervical levels because a CT scan would provide a "better evaluation." Consequently, the abnormality detected by the limited MRI might in fact be even more severe than noted in the radiologist's evaluation.

There is another deficiency in Cigna's evaluation of Patricia's claim. Ms. Petrillo says that the medical information was reviewed by Cigna's "nurse case manager" and its "associated medical director." The medical credentials of neither was disclosed, and their qualifications to evaluate of Patricia's physical injury are not established. Dr. Jaff, Patricia's treating physician, is a Board Certified Physiatrist, with a specialization in physical medicine and rehabilitation. Moreover, they merely conducted a "file review" without any actual physical examination of Patricia, even though Cigna has the right to conduct such an examination under the plan. (¶ 8.8 at p. 28).

Angela Flaherty Miller
Claimant: Patricia Harris-Lee
April 24, 2007
Page 7

## POST-TRAUMATIC STRESS DISORDER

In its letter of June 30, Cigna acknowledges that Dr. Bassel referred Patricia to Dr. Paley-Galst for a psychological evaluation. Cigna also acknowledges that Dr. Paley-Galst made a diagnosis of post-traumatic stress disorder arising from the incident at work. Nevertheless, despite this diagnosis, Cigna concluded that Patricia is not disabled. As explained by Cigna, this conclusion is based on two considerations. First, Cigna emphasizes that Patricia continued to work until May 30, 2006. Second, Cigna surmised that after she left work, Patricia was no longer being treated for post-traumatic stress disorder. This determination is deficient in several important respects.

As noted above, Patricia explained in her letter of appeal why she remained at work. She made clear that her effectiveness was significantly compromised by the assault and that her symptoms were aggravated by her employer's failure to remedy the situation with her abusive supervisor as promised. Hopeful of getting some redress, she remained exposed to the same harmful work conditions as long as she could. It has long been recognized that a continuation of work under such circumstances does not preclude a recovery of disability benefits. See, e.g., *INA Life Ins. Co. of New York v. Davis*, 404 So.2d 397 (Fla Ct.App. 1981); *Walker v. Equitable Life Assurance Society of the United States*, 123 F.Supp. 306 (E.D. Ill. 1954). Patricia made a good faith effort to remain at work; it was a period of short duration; and she left work on her doctor's recommendation to avoid aggravating the symptoms of her disorder.

Cigna concluded that since Dr. Paley-Galst reported that Patricia "discontinued psychotherapy" as of June 1, 2006, Patricia was no longer receiving psychological treatment for the diagnosed disorder of that date. However, Patricia explained to Cigna her decision to stop treatment with Dr. Paley-Galst. She could not afford to pay Dr. Paley-Galst's hourly rate. That was a concern that she specifically discussed with Dr. Bassel when he first suggested the referral. Consequently, Patricia's decision not to continue with Dr. Galst was purely to a financial one. It was not for lack of a need for treatment for her post-traumatic stress disorder. In fact, Patricia continued her treatment with Michelle Burrell.

Indeed, Cigna's letter of November 2 expressly acknowledges that Dr. Paley-Galst reported that Patricia was "still symptomatic" as of the date that she last treated Patricia.

Another factor in Cigna's initial denial was its assertion that Patricia was not taking any medication for her disorder. In this regard, Cigna relies on the "Behavioral Health Questionnaire" completed by Dr. Paley-Galst at Cigna's request on June 1, 2006. Cigna refers to a brief notation that Patricia was not taking any medication as of that date. But Dr. Paley-Galst's statement signified only that she herself had not prescribed any medication. Cigna made no attempt to find out whether Patricia had received a prescription from any of her other treating physicians. Patricia explained that had not discussed the subject of medications with Dr. Paley-Galst.

Angela Flaherty Miller
Claimant: Patricia Harris-Lee
April 24, 2007
Page 8

In her appeal letter, Patricia explained that in May, 2006, she had obtained a prescription from Dr. Thornton, her primary care physician, to alleviate her pain and tension. She specifically identified the two prescription drugs and dosage: Carisoprodol (350 mg) and Naproxen (500 mg). Patricia had originally informed Cigna that she was taking these drugs in her claim form dated June 7, 2006, two weeks prior to Cigna's denial of her claim. On that same claim form, she also told Cigna that a side effect of these drugs was her "inability to focus." Cigna has completely ignored information readily available in its own claim file.

According to Cigna's letter of November 2, its unidentified "Behavioral Health Specialist" claimed that Ms. Burrell was "not able to provide symptoms related to this diagnosis [post-traumatic stress disorder]." However, Dr. Galst had previously described Patricia's symptoms to Cigna in her evaluation dated May 10, 2006: "sleep difficulty, decreased appetite, loose stools, reduced ability to concentrate, feelings of depression and back pain, all of which began after an incident with a supervisor at her work place."

Moreover, Cigna received Ms. Burrell's letter of September 12, 2006 which reported Patricia's symptoms as "difficulty sleeping, anxiety, anger, and fear." Whatever may have taken place in Ms. Burrell's conversation with Cigna's "Behavioral Health Specialist," Cigna's insistence that Ms. Burrell "could not provide symptoms related to this diagnosis" is flatly contradicted by her letter of September 12.

Cigna complains that there was no mental status exam, which, in its view, was necessary to "evaluate your reported cognitive deficit." But that deficit was already established by the evaluations provided by Patricia's treating physicians. Cigna cannot ignore such medical evidence by arbitrarily insisting on a further diagnostic tool that would merely confirm the diagnosis already made by the treating physicians. If Cigna had some legitimate reason to question the diagnosis by the treating physicians, it was free to conduct its own inquiry, but it chose not to do so. Cigna cannot rely on sheer speculation that a "mental status" exam would somehow show that Patricia was able to resume work.

The very nature of the symptoms associated with the disorder—inability to concentrate, depression, anxiety, anger, lack of sleep—by themselves sufficiently establish a "cognitive deficit." As noted above, these were aggravated by the side effects of the medications. Such symptoms are enough to interfere with the ordinary activities of daily living, let alone the varied and demanding responsibilities of a stressful work environment.

Cigna states that "there is no record of medical [sic] on or around your last day of work that would describe what changed in your conditions." It is not clear what Cigna is saying on this point. Cigna apparently means to say that there was nothing in the submitted medical records specifically pertaining to May 26th. However, if that is what is meant, Cigna assumes that proof of disability requires such specific evidence to show a "change in conditions." Once again, Cigna ignores the information provided by Patricia. As explained in her letter of August 4, her continuation of work had become deleterious to her health and well-being and was found to be so by both Dr. Paley-Galst and Dr. Bassel.

Angela Flaherty Miller
Claimant: Patricia Harris-Lee
April 24, 2007
Page 9

Moreover, the worker's compensation decision, discussed below, provides confirmation that Patricia's disabilities impaired her ability to carry out her job responsibilities.

As noted above, Cigna's initial denial of benefits was based upon a review of records by "our nurse manager" and the "associated medical director." Neither is a psychiatrist or otherwise qualified to exercise medical judgment in regard to that field of medicine generally or to post-traumatic stress disorder specifically.

Cigna's letter of November 2 states that it relied on a review by an unnamed "Behavioral Health Specialist." This "specialist" was not identified as a psychiatrist nor were that person's credentials disclosed. ERISA requires that on appeal Cigna must consult with "a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 CFR § 2560.503-1 (h)(3)(iii). Cigna has not shown that it complied with this regulation.

## THE WORKERS COMPENSATION AWARD

In 2006, Patricia filed a claim for workers' compensation benefits (WCB Case No. 0063 1592). After a hearing on February 13, 2007, an award was entered in her favor. In relevant part the Decision of the Workers' Compensation Board states:

> The claimant Patricia Harris-Lee had a work-related injury, neck, back and reactive anxiety disorder . . . . Medical treatment and care, as necessary, for established sites of injury and/or conditions, is authorized . . . . Physical therapy is authorized.

The award of benefits is based on the Board's determination that Patricia's disability commenced on June 30, 2006. Past benefits were awarded for the period for June 30, 2006 to February 14, 2007, a period of 32.6 weeks. In addition to the payments of accrued benefits, the workers compensation judge ordered that "the carrier . . . continue payments at $400."

Accordingly, the award establishes that Patricia as been disabled for the entire 26-week benefit period covered by the STD plan and that her disability continues.

A copy of the Board's Notice of Decision is enclosed as Exhibit A.

Although Cigna is not necessarily bound by the a decision of a worker's compensation judge, it would render an arbitrary decision if it denies Patricia disability benefits based on the conclusory evaluations of its medical reviewers that are contradicted by both her treating physicians and the worker's compensation decision. See, *Pierce v. American Waterworks Company, Inc.* 683 F.Supp. 996 (W.D. Penn. 1988).

In *Pierce*, the federal court held that the plan administrator's denial of disability benefits was arbitrary because it relied on "the unsupported conclusory opinion of a non-examining, non-

Angela Flaherty Miller
Claimant: Patricia Harris-Lee
April 24, 2007
Page 10

treating physician which was contradicted by the plaintiff's own treating physician and the social security opinion . . . ." Just as the plan administrator in *Pierce* was "irrational" to ignore the decision of the Social Security Administration, a decision by Cigna that ignores the worker's compensation decision here also would be irrational.

## UPDATED MEDICAL INFORMATION

Patricia continues to receive treatment for both the physical injury and post-traumatic stress disorder. Enclosed are copies of the following reports:

(1) Dr. Jaff's progress reports dated November 10, 2006 and February 6, 2007 (Exh. B);

(2) Dr. Jaff's physical therapy prescription dated December 29, 2006 and a physical therapy report dated January 3, 2007 (Exh. C);

(3) A progress report from Michele Burrell, LCSW dated February 13, 2007 (Exh. D); and

(4) A psychiatric evaluation by Hamid Moussavian, MD, dated December 5, 2006 (Exh. E).

Under federal regulations governing ERISA plans, Cigna is required to consider the enclosed, updated medical information "without regard to whether such information was submitted or considered in the initial benefit determination." 29 CFR § 2560.503-1(h)(2)(iv).

## CONCLUSION

For the reasons explained above, Patricia is disabled within the meaning the STD Plan. Her disabilities began no later than May 30, 2006 and continue as of this date. As explained above, she continues to receive treatment for both her back injury and post-traumatic stress disorder.

Accordingly, Patricia has been continuously disabled for the past eleven (11) months. Therefore she is entitled to receive STD benefits for the maximum benefit period of 26 weeks. Patricia selected the STD benefit option that pays her 90% of her covered earnings. Since Patricia was earning an annual salary of $57,000, her monthly salary was $4,750.

The amount of her total STD benefits was would be calculated as follows:

.90 x $4,750 x 6.5 (26 weeks) = $27,787.50

I recognize that the STD plan includes an "Other Income Benefits" provision (¶ 6.9). However, that provision permits, but does not require, a reduction of the STD benefits by the

Angela Flaherty Miller
Claimant: Patricia Harris-Lee
April 24, 2007
Page 11

amount of workers' compensation benefits. The workers' compensation decision awarded Patricia $400.00 per week for her disabilities. Past payments totaled $13,040 (i.e., 32.6 x $400 = $13,040.00).

There are several reasons why Patricia's STD benefits should not be reduced by the workers' compensation benefits. First, as just noted, any such reduction is discretionary, not mandatory. Second, equitable considerations weigh against Cigna's application of any offset. Cigna's initial denial of benefits last June and the denial on appeal in November erroneously deprived Patricia of STD benefits that she should have received. Furthermore, Patricia did not receive any workers' compensation benefits until after the decision of February 13, 2007. Consequently, she did not actually receive any workers' compensation benefits during the first eleven months of her disabilities. Without the expected and much-needed benefits from either source, Patricia was forced to deplete her savings in order to meet her daily expenses. The belated payment of STD benefits reduced by an offset will not lessen the impact of the financial hardship that Patricia has endured.

Therefore, in view of these equitable considerations, I request that Cigna exercise its discretion to authorize a full payment of STD benefits without an offset for the workers' compensation benefits.

Patricia and I look forward of Cigna's review of this matter on a timely basis and, in any event no later than 60 days from submission of this request for review. We also look forward to a decision that is based on a full and fair review as required by ERISA.

In accordance with the foregoing, Cigna's decision should include a determination that Patricia is disabled as defined by the STD plan and entitled to benefits for the full 26-week benefit period. In conjunction with your decision, please issue payment by check payable to Patricia Harris-Lee in the amount of $27,787.50.

Very truly yours,

Samuel F. Barnum

SFB:ms

w/ enclosures

cc     Patricia Harris-Lee

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x

PATRICIA HARRIS LEE,                                        07 CV 6733 (SM)

                          Plaintiff,                          PLAINTIFF'S LOCAL RULE
                                                                           56.1(b) COUNTER-
         -v -                                             STATEMENT IN
                                                                           OPPOSITION TO
                                                                           DEFENDANTS' MOTION TO
SONY BMG MUSIC ENTERTAINMENT, INC, and                                     DISMISS OR
BARBARA WARNOCK-MORGAN, Individual                                         ALTERNATIVELY, FOR
                                                                           SUMMARY JUDGMENT

                        Defendants.
--------------------------------------------------------------------x

       Pursuant to Rule 56.1(b) of the Local Civil Rules, Plaintiff PATRICIA HARRIS

LEE, through undersigned counsel of record, hereby submits the following counter-

statement of material facts in opposition to Defendants' statement pursuant to Local Rule

56.1 in support of Defendants' Motion to Dismiss, or alternatively, for Summary

Judgment ("Defendants' 56.1").  Plaintiff respectfully submits that Defendants' Motion

to Dismiss, or alternatively, for Summary Judgment sets forth many issues that raise

genuine issues of material fact that warrant denial.

      1.      Undisputed for purposes of this motion.

      2.      Undisputed for purposes of this motion.

      3.      Disputed in part.

      On March 31, 2006, Warnock-Morgan physically attacked the plaintiff without

provocation, causing plaintiff to sustain back, neck, and psychological injuries.

(Amended Complaint ¶24).

      4.      Disputed.

Warnock-Morgan baselessly accused plaintiff of orchestrating the March 30, 2006 meeting in her absence so as to undermine her management decisions. (HL Decl. ¶10).

5.     Undisputed for purposes of this motion.

6.     Disputed.

During the March 31, 2006 incident, plaintiff pleaded with Warnock-Morgan to stop her aggressive and threatening behavior and to calm down. (HL Decl. ¶11).

7.     Disputed.

While Warnock-Morgan was yelling and verbally attacking plaintiff, Warnock-Morgan charged up to the plaintiff so that they were face to face and thrusted her hands in front of plaintiff's face. (HL Decl. ¶11).

8.     Disputed in part.

During the March 31, 2006 incident, Warnock-Morgan had backed plaintiff up against the wall. Since she was shaking out of anger and had her hands flailing about, plaintiff grasped her wrists to keep Warnock-Morgan from hitting her. (HL Decl. ¶11).

9.     Undisputed for purposes of this motion.

10.     Undisputed for purposes of this motion.

11.     Disputed.

On April 3, 2006 plaintiff informed the human resources department ("Sony HR") that she no longer desired to work with Warnock-Morgan and asked Kathleen Kelley if she knew what was going on in other departments and/or the possibility of being transferred or reassigned. (HL Decl. ¶17).

12.     Disputed in part.

Plaintiff requested that Sony HR follow up with her regarding defendants investigation into the March 31, 2006 incident and provide her with a copy of the investigation report. Plaintiff had also inquired about what remedial measures, if any, defendant would take against Warnock-Morgan. However, Sony HR failed to respond to any communications plaintiff sent them. ("HL Decl. ¶25-27).

13.    Disputed in part.

On April 14, 2006, Dr. Bassel, who was plaintiff's treating physician, notified defendant of the seriousness of plaintiff's medical condition. He also urged defendants to physically separate plaintiff from Warnock-Morgan because of his concern over their close physical proximity. Dr. Bassel then stated that he would release plaintiff to go back to work, under doctor supervision, if the matter at work could be quickly resolved. (HL Decl. ¶19).

14.    Undisputed for purposes of this motion.

15.    Undisputed for purposes of this motion.

16.    Undisputed for purposes of this motion.

17.    Disputed in part.

Plaintiff has appealed Cigna's denial of her claim. (HL Decl. ¶31).

18.    Disputed in part.

Plaintiff has appealed Cigna's denial of her claim. (HL Decl. ¶31).

19.    Disputed in part.

Plaintiff has appealed Cigna's denial of her claim. (HL Decl. ¶31).

20.    Undisputed for purposes of this motion.

21.    Disputed.

3

Plaintiff has appealed Cigna's denial of her claim.  (HL Decl. ¶31).

22.    Undisputed for purposes of this motion.

23.    Undisputed for purposes of this motion.

24.    Disputed in part.

After the March 31, 2006 incident, plaintiff suffered from physical and

psychological injuries, including but not limited to: traumatic cervical, thoracic, and

lumbosacral pain syndrome with spasm, severe reactive anxiety disorder, post traumatic

stress disorder, and depression.  (HL Decl. ¶13).

25.    Undisputed for purposes of this motion.

26.    Undisputed for purposes of this motion.

27.    Disputed in part.

Plaintiff expressed her concerns of being retaliated against but Sony HR repeated

showed an indifference to plaintiff's concerns.  (HL Dec. ¶25).

28.    Disputed.

Plaintiff has alleged that Warnock-Morgan had singled her out for the March 31,

2006 attack because of her race.  Plaintiff has also alleged that Sony HR's repeated

pattern of ignoring plaintiffs' concerns was based upon her race.(HL Decl. ¶ 9, 28).

Dated: New York, New York
       March 6, 2008

LEVINE & BLIT, PLLC

_____
MATTHEW J. BLIT (MJB 4145)

*Attorney for Plaintiffs*
Empire State Building
350 Fifth Avenue, Suite 6902
New York, NY 10118

4

Phone: (212) 967-3000
Fax: (212) 967-3010