**<u>Preliminary Statement</u>**

This memorandum of law is respectfully submitted of behalf of Plaintiff PATRICIA HARRIS-LEE ("Plaintiff" or "Harris-Lee") in opposition to Defendants' motion, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure ("FRCP") for an order granting summary judgment of the Second Amended Complaint dated May 30, 2008, with prejudice.

Plaintiff was an employee of Defendant, SONY BMG MUSIC ENTERTAINMENT ("Sony-BMG") for approximately 16 years. Her last position was Associate Director of Advertising Management Employment. She consistently received satisfactory and outstanding performance evaluations. On March 31, 2006, Plaintiff's supervisor, Defendant BARBARA WARNOCK-MORGAN ("Warnock-Morgan") singled her out and assaulted her because of her race, causing back, neck and psychological injuries. This attack was unprovoked.

In her capacity as Associate Director of Advertising Management Employment, Plaintiff was the only black employee in the department consisting of four (4) other employees. Her supervisor, Warnock-Morgan is Caucasian.

Precipitating the attack, Warnock-Morgan accused Plaintiff of orchestrating a departmental meeting in her absence to undermine Warnock-Morgan's management decisions. This claim was totally unsubstantiated. During a meeting with members of the department on March 30, 2006, Warnock-Morgan became extremely angry and confrontational with the issues being discussed. Unprovoked, she began to yell and curse at Plaintiff. During this attack, Plaintiff sat speechless and shocked. Both Plaintiff and the staff asked Warnock-Morgan to compose herself, and the meeting came to a close without further incident.

On March 31, 2006 after a heated conversation between Harris-Lee and Warnock-Morgan relating back to some of the issues raised during the departmental meeting the prior

afternoon, Warnock-Morgan charged at Plaintiff waving her hands menacingly, and lunged at Plaintiff, pinning her against a wall.   The assault caused the Plaintiff neck, back, and psychological injuries, and necessitated her taking an extended medical leave of absence.

The attack was reported to the Human Resources Department ("HR"), specifically to Kathleen Kelly ("Kelly") and Dan Alcock ("Alcock"), both Caucasian, on April 3 and 17, 2006. HR failed to act upon Plaintiff's reports of the incident, and Plaintiff was forced to continue to work under Warnock-Morgan's direct supervision and order.   Further, HR forced Harris-Lee to cover Warnock-Morgan's position and duties while she took paid unscheduled vacation days following the attack.  Despite Plaintiff's continual expression of fear and displeasure of working in close proximity with her attacker, HR insisted that Plaintiff wait for the outcome of their investigation into her assault.   From April 4, 2006 until May 26, 2006, Plaintiff's emails and calls to Kelly went unanswered.

Sony-BMG offered no amicable resolution to Plaintiff, nor did it assume any responsibility for safeguarding her mental and physical health and safety while she worked on its premises, as outlined in the company's policy manual.  Sony-BMG has a zero tolerance policy against violence in the work place and any violence usually results in immediate termination, yet Warnock-Morgan retained her position whereas Harris-Lee was constructively discharged from her employment by being forced to work in a severely hostile environment under the direction of the woman who had physically assaulted her.

The assault of Plaintiff is not disputed.  Warnock-Morgan called Plaintiff and left a voice message apologizing for the attack.   In the message Warnock-Morgan blamed her actions on violent mood swings brought about by steroid medications she had been taking. Sony-BMG has a policy that prohibits any and all controlled substance use on the premises.  All employees are

obligated to report any use, legal or illegal, that may prohibit job performance or fitness for duty. Violation of this may result in immediate termination or suspension without pay, yet Warnock-Morgan was not disciplined for violating this policy.

On May 30, 2006, based on advice from her doctor that emotional stress from working in a hostile environment would exact a toll on her well being, Plaintiff took a medical leave of absence. This emotional stress was based on the attack by Warnock-Morgan and in large part on Plaintiff being ignored by HR; and based on her fear that working with Warnock-Morgan was further exacerbating her mental and physical condition,

On June 6, 2006, Plaintiff learned that she had been removed from Sony-BMG's payroll. With the exception of vacation pay (15 days), she did not receive any other paychecks despite the fact that she is entitled to ninety percent (90%) of her salary while on leave through Sony BMG's long term disability policy. Due to Sony-BMG's objections, Plaintiff was initially denied Worker's Compensation benefits. Plaintiff was finally released from her employment by Sony-BMG in March 2009 after sending correspondence asking for a formal separation from their employ in January in an effort to gain benefits resulting from a separation, i.e. COBRA and pension moneys.

Based on the foregoing reasons, Plaintiff charges that Sony-BMG has deliberately disregarded its own policies to protect Warnock-Morgan. Additionally, Defendant Sony-BMG committed unlawful discriminatory practices relating to Plaintiff's employment solely based on her race and/or color; and in retaliation of her opposition to discrimination in violation of the New York State Human Rights Law and Title VII of the Civil Rights Act of 1964 ("Title VII").

# I.  **Indisputable Facts**

The uncontroverted facts establish that Warnock-Morgan and Sony-BMG engaged in illegal discrimination against the Plaintiff.   As further described below, Warnock-Morgan targeted Harris-Lee because she was an African-American; Warnock-Morgan committed an assault against Harris Lee because of her race.   Warnock-Morgan initially admitted that she was at fault in a recorded telephone message.   Defendants are now, insultingly, trying to turn the tables on Harris-Lee with innuendo and insinuations to suggest that the altercation was somehow Harris-Lee's fault.  Ex. A, *Transcript of Kathleen Kelly* ("KK Transcript") at 74-5.   As further described, Sony-BMG failed to address Harris-Lee's claims with the seriousness that they would have were the complainant Caucasian.   The Caucasian only HR staff of Sony-BMG failed to timely address an assault that was perpetrated by a Sony-BMG supervisor against a Sony-BMG employee. Ex. B, *KK Transcript* at 57.   Sony-BMG failed to keep Harris-Lee apprised of the progress of the investigation into the assault, but Harris Lee would witness Warnock-Morgan meeting to discuss the incident while she was isolated and ignored because of her race. Ex. C, *KK Transcript* at 222-4.   Sony-BMG failed to ensure the safety of Harris Lee who was being targeted because of her race, but took care to excuse the drug use and racism by her supervisor, Warnock-Morgan.  Ex. D, *Id.* at 67.

## A.  **Defendant Warnock-Morgan's Discrimination**

Warnock-Morgan is a Senior Director of Operations, one of several within the Creative Services Department at Sony-BMG.   Ex. E, *Transcript of Warnock-Morgan* ("BWM Transcript") at 40.  Warnock-Morgan's current position is not the one she held at the time that she discriminated against Harris-Lee. Ex. F, *BWM Transcript* at 38-40.  Whereas Harris-Lee has been constructively discharged from Sony-BMG, Warnock Morgan has instead received

4

promotions. Ex. G, *BWM Transcript* at 38. At the time of the assault, Warnock-Morgan was the Director of Print Media. Ex. H, *BWM Transcript* at 38. Harris-Lee, who had worked for Sony-BMG and its predecessors for almost 16 years, was an Associate Director of the Advertising Management Department, and one of Warnock-Morgan's several reports. Ex. I, *Transcript of Patricia Harris-Lee* ("PHL Transcript") at 10. Harris-Lee was an excellent employee, who parlayed a volunteer Intern position into an outstanding career in which she successfully climbed the corporate ladder at Sony-BMG and its predecessors. Ex. J, *PHL Transcript* at 10-15. During 2006, Warnock-Morgan was the immediate supervisor of four (4) Sony-BMG employees. Ex. K, *BWM Transcript* at 46. Harris-Lee was the only report of African American descent. Ex. L, *BWM Transcript* at 46.

Warnock-Morgan is known to have been involved in racist incidents. On one prior occasion, Harris-Lee accompanied Warnock-Morgan for a social event out of work. Warnock-Morgan relayed to their group her amusement that an African-American colleague she had been out to drinks with did not like watermelon flavor martinis. Ex. M, *BWM Transcript* at 52-3. Even within the confines of Sony-BMG, Warnock-Morgan's racism was complained about. An employee identified as Marcella has accused Warnock-Morgan of being a racist. Ex. N, *BWM Transcript* at 411. Warnock-Morgan herself admitted this to Harris-Lee. Ex. O, *BWM Transcript* at 413.

Warnock-Morgan undertook in-vitro fertilization cycle for a six (6) week period from on or about the middle of February 2006 until on or about the end of March 2006. The cycle "left [her] very emotionally raw. It was very draining. It was tiring. And [she] was preoccupied." Ex. P, *BWM Transcript* at 81. The cycle failed to produce a pregnancy, and Warnock-Morgan had a Dilation and Curettage procedure on or about Wednesday, March 29, 2006. Upon her

return to work on March 30, 2006, Warnock-Morgan and her reports met during lunch.  Ex. Q, *PHL Transcript* at 57.  Ms. Harris-Lee helped arrange this meeting with Warnock-Morgan and other of her reports.  Ex. R *BWM Transcript* at 114.  The other employees in attendance were Messrs. Robert Henzi ("Renzi"), Esteban Reichberg ("Reichberg"), and Brendan Villardo. Ex. S, *PHL Transcript* at 76-8.  The meeting was to discuss rumors regarding the future of the department.  These rumors were false and started by Warnock-Morgan herself.  Harris-Lee Decl. at ¶4.  Initially, Henzi began to badger her with rapid fire questions in and aggressive manner.  Ex. T, *BWM Transcript* at 87.  Warnock Morgan did not respond to Henzi's line of questioning by assaulting Henzi.  Ex. U *BWM Transcript* at 88-9.

The next day, on March 31, 2006, Harris-Lee came into Warnock-Morgan's room to discuss the possibility of leaving early as she had spent extra hours at work on March 31, 2006 helping another Sony-BMG employees move offices.  Ex. V, *BWM Transcript* at 126-7.  .  The conversation between Harris-Lee and Warnock-Morgan quickly turned to some of the issues that had been discussed at the meeting the day before, and became quite heated.  Ex. W, *BWM Transcript* at 128-9.    There were discussions as to the ulterior motives, respectively, of Warnock-Morgan helping Yvonne Erickson with outdoor advertising Harris Lee helping Dennis Ventorino move files into his new offices.  Ex. X, *PHL Transcript* at 98-9.  Warnock-Morgan also referred to Henzi and Reichberg as "morons" in questioning why Plaintiff was seeking their feedback about the lunchtime meeting that occurred on March 30, 2006.  Ex. Y, *PHL Transcript* at 97–105.  Warnock-Morgan became upset and stated "I can't take this anymore.  I need to go home."  Ex. Z, *BWM Transcript* at 130.  Warnock-Morgan then took her coat and purse and left the office, leaving Harris-Lee alone.  After composing herself after the stressful meeting, Harris-Lee left Warnock-Morgan's office and began to walk to the ladies' restroom.  Ex. AA, *PHL*

*Transcript* at 105-110.  Harris-Lee was looking down toward the ground when "…I see her, she's got her coat and backpack on, her hands are elevated, her arms are up, her hands open and she's charging towards me like a bull and I stopped dead in my tracks right there in the middle of the hallway because she's coming at me fast.  And I start to run back and slam into the edge of the corridor." Ex. BB, *PHL Transcript* at 111-2.  Harris Lee is backed up against the wall and "[Warnock-Morgan] thrust her hands in my face, down toward my face basically… I see Barbara's hands coming down toward my face and I try to reach for her hands, but I end up grabbing her by the wrists." Ex. CC, *PHL Transcript* at 113-4.  As the interaction continued, Warnock-Morgan "wished two miscarriages" on Harris-Lee.  Ex. DD, *BWM Transcript* at 136.  Later that evening Warnock-Morgan admitted her fault for the incident by phoning Harris-Lee to apologize for it.  Ex. EE, *BWM Transcript* at 146.

## B. Defendant Sony-BMG's Discrimination

Sony-BMG disseminates a document to its employees called the "HR Policy Manual Sony-BMG" ("Policy Manual").   It states that "Sony BMG values and promotes diversity as a strategic advantage.  It is dedicated to creating an environment in which all employees can contribute to their fullest potential." Ex. FF, (*Policy Manual)* at Policy Number 11.  It states "Employees who believe they have been subjected to prohibited discrimination or harassment should immediately report the incident to… Human Resources.  Complaints are investigated promptly and handled as confidentially as possible.  Sony BMG ensures that employees following this complaint procedure are protected against illegal retaliation."  Ex. GG, Policy Manual at Policy Number 10.  In this case, Harris-Lee reported her incident with Warnock-Morgan immediately.  After the events transpired on Friday, March 31, 2006, Harris-Lee called HR at Sony-BMG several times on Monday morning, April 3, 2006 when she came into work.

7

Ex. HH, *PHL Transcript* at 170. The investigation did not proceed promptly however – it was more than two (2) weeks before Harris-Lee and Warnock-Morgan met together with HR in person to discuss a plan of action. Ex. II, *PHL Transcript* at 202. Neither did Sony-BMG protect Harris-Lee against further retaliation –Harris-Lee was denied her rightful insurance and disability claims because Sony-BMG influenced the incident investigations. Ex. JJ, *PHL Transcript* at 427-29. Sony-BMG also placed Harris-Lee back under the supervision of Warnock-Morgan, an outrageous plan of action given that it forced Harris-Lee to work for a supervisor who had just assaulted her. Ex. KK, *KK Transcript* at 88. Sony-BMG further violated its own corporate policies which state "Managers or employees found to have engaged in discriminatory conduct or harassment are subject to immediate disciplinary action, including possible suspension without pay and/or termination of employment." Ex. LL, *Policy Manual* at Policy Number 10. Despite the language of the manual, Warnock-Morgan was not suspended without pay; on the contrary she retained her position and was subsequently promoted. Ex. MM, *BWM Transcript* at 40. Warnock-Morgan was not terminated; on the contrary she retained her position and was subsequently promoted. Ex. NN, *KK Transcript* at 67. Harris-Lee on the other hand was placed back into a setting working for Warnock-Morgan which she told HR she was uncomfortable with. Ex. OO, *PHL Transcript* at 67. Incredibly, proscriptions on *Harris-Lee's* behavior were implemented – she was told to report her comings and going to Warnock-Morgan. Ex. PP, *KK Transcript* at 67. No such proscriptions were placed on Warnock Morgan; on the contrary she retained her position and was subsequently promoted. Ex. NN, *KK Transcript* at 67.

Sony-BMG's corporate policy states "With so many differences between people, some amount of interpersonal discomfort, tension and conflict is an inevitable and natural part of life.

The solution in the workplace… is to create an environment in which each person feels seen, heard, and valued." Ex. QQ, *Policy Manual* at Policy Number 13. Yet HR completely ignored the many emails Harris-Lee sent trying to follow up about HR's investigation of the incident in which she was assaulted by her supervisor Warnock-Morgan. Ex. RR. In an email sent from Harris-Lee to Kelly on Tuesday, April 4, 2006 at 5:57 p.m., Harris-Lee documents a meeting on that day at 3:45 PM in which Warnock-Morgan treated Harris-Lee rudely. Ex. RR. Harris-Lee documented her fear that "I just hope this isn't the start of retaliation. As I already stated, I would like to move forward from the incident." Ex. SS. Defendants have supplied no documentation that the email was ever replied to or acted on. In an email sent from Harris-Lee to Kelly on Friday, April 7, 2006 at 4:04 PM, Harris-Lee recounts to Kelly that "I'm a little anxious for the truth. Some of my colleagues have stop (sic) speaking to me and they are avoiding eye contact with me. God only knows what they have been told." Ex. TT. Defendants have supplied no documentation that the email was ever replied to or acted on. On Thursday, April 13, 2006 at 4:47 PM, Harris-Lee sent an email to Kelly stating "I would like to receive a copy of the Human Resources report, that document (sic) my complaint and the responses from Adam Owett and Barbara Warnock-Morgan regarding the incident; upon your conclusion of the investigation." Ex. UU. Defendants have supplied no documentation that the email was ever replied to or acted on. In an email sent on Wednesday, April 19, 2006 at 12:52 PM from Harris-Lee to Kelly asked again for the HR file on the incident and reiterates to Kelly that "I have become even more uncomfortable with our current situation." Ex. VV. Defendants have supplied no documentation that the email was ever replied to or acted on. In an email sent on Friday, April 28, 2006 at 1:34 PM, from Harris-Lee to Kelly, she writes "I would like to know when I can expect to receive my copy of the incident report from Human Resources." Ex. WW.

Defendants have supplied no documentation that the email was ever replied to or acted on. Incredibly, Kelly acknowledges repeatedly in her deposition that she could sympathize with Harris-Lee's plight of being tormented by her supervisor because Kelly experienced a similar incident of harassment by her own supervisor, but then admits that she didn't speak in person with Harris-Lee until the 17th of April, 2006 because she didn't think it was "necessary" to speak with her. Ex. XX, *KK Transcript* at 56. This assessment is outrageous given that Kelly further admits that the April 17th, 2006 meeting was precipitated by the fact that things were "incredibly tense" in their department. Ex. YY, *Id.* at 64. Kelly also admits that the incident "wasn't a little tiff. It was a little bigger than that. [Barbara] knew she was out of line." Ex. ZZ, *Id.* at 72.

On the afternoon of April 3, 2006, Harris Lee approached Kelly to tell her "what happened, what was happening, what led up to what happened… [S]he said that she would get back to me once she spoke to Adam, who's Adam Owett…and she never got back to me." Ex. AAA, *PHL Transcript* at 44. Kelly astonishingly seems to have written off the incident altogether by the time she saw Harris-Lee in the elevator on or about April 12, 2006. Kelly said to Harris-Lee regarding HR's resolution of the assault "I told [Adam Owett] that Barbara [Warnock-Morgan] needs to be nice to Pat [Harris-Lee]." Ex. BBB, *Id.* at 45. Kelly admits that HR was on notice that Harris-Lee was characterizing her relationship with Warnock-Morgan after the incident as "abusive." Ex. CCC, *KK Transcript* at 52. Kelly admits that Harris-Lee had a right to be frightened: "Barabara is a big woman. And there was very close contact there the way it was described to me… it was the physical proximity that I think frightened Ms. Harris-Lee." Ex. DDD, *Id.* at 54. Still, no punishment was meted out by HR against Warnock-Morgan; no attempt was made to move Harris-Lee out from under the supervision of Warnock-Morgan. The totality of HR's "resolution" of this incident seems to be a nebulous directive that Warnock-

Morgan be nicer to Harris-Lee, and that Harris-Lee report her comings and goings to the perpetrator of the assault, her supervisor Warnock-Morgan. Ex. EEE, *PHL Transcript* at 66.

On or about April 14, 2006, Harris-Lee's doctor, Dr. Bassel made contact with HR and relayed to them Harris-Lee's wishes not to continue working with Warnock-Morgan. Ex. FFF, *PHL Transcript* at 49. Kelly fails to admit the fact that Dr. Bassel recommended that Harris-Lee be transferred to a position in which she didn't have to work under Warnock-Morgan. Ex. GGG, *KK Transcript* at 59. Neither was there any change in the dynamic in which Harris-Lee continued to report to Warnock Morgan.

On April 17, 2006, a meeting was scheduled by HR with Warnock-Morgan and Harris-Lee. Ex. HHH, *Id.* at 64. The meeting was scheduled because things were "extremely tense" between Harris-Lee and Warnock-Morgan and other Department employees were wary of speaking with Ms. Harris-Lee after the incident. Ex. III, *Id.* at 64-5. Kelly sensed during the meeting that things were tense between Harris-Lee and Warnock-Morgan. Ex. JJJ *Id* at 81. Kelly was concerned that Harris-Lee "wasn't talking. She was there. And she was willing to sit and listen. She didn't want to necessarily partake in the meeting." Ex. KKK, *Id.* at 82. Knowing that Harris-Lee was not a full participant in the meeting, it is incredible that no further meetings were scheduled to follow up. Neither apparently did HR adopt any plan to follow up to ensure that Harris-Lee was working in the "safe and healthy workplace" Sony-BMG alleges it is committed to providing for its employees. Ex. LLL, *Policy Manual* at Policy Number 21. Sony-BMG did everything they could to prevent Plaintiff from obtaining her workers compensation benefits and her disability benefits. Plaintiff gave a statement to the investigator for her workers compensation carrier of which Defendants' have cited to in the Clemon Williams Declaration. Those excerpted statements are not accurate and are not a correct transcription of what was said

by the Plaintiff.  In fact, Plaintiff subpoenaed the original tapes as part of this litigation but that subpoena was never responded to.  Harris-Lee Decl. at ¶¶10-11.

**ARGUMENT**

**DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT**

**A.  Governing Standards**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the Complainant is entitled to judgment as a matter of law." *Fed R. Civ. P*. 56(c).  The Court's responsibility is to determine if there is a genuine issue to be tried, and not to resolve disputed issues of fact.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).  In determining whether a genuine issue of material fact has been raised, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *United States v. Diabold, Inc.,* 369 U.S. 654, 655 (1962).  However, summary judgment may be granted "[i]f the evidence is merely colorable, or in not significantly probative. *Id* at 249-50.

The party seeking summary judgment bears the burden of showing that no genuine factual dispute exists.  *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2nd Cir. 1995).  Once the moving party has made a showing that there are no genuine issues of material fact, the burden shifts to the nonmoving party to raise triable issues of fact.  *Anderson, 477* U.S. at 250.  A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non moving party.  *Id.* at 248.

Summary judgment in a discrimination case is proper only if Defendant persuades the court that no reasonable jury could find in Complainant's favor, even drawing all inferences from the record evidence and in viewing it in a light most favorable to Complainant.  *Reeves v.*

*Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150-151 (2000). There, the Court ruled that Courts "...must draw all reasonable inferences in favor of the non-moving party, and it may not make credibility determinations or weigh the evidence." *Id.* at 150.

> A jury must perform the traditional functions of assessing the weight of the evidence, the credibility of the witnesses, through observation of both direct testimony and examination at trial, and the strength of the inferences that can be drawn from the elements of a prima facie case, and the evidence that undermines the employer's proffered reasons for its actions. This is uniquely the role of a fact finder, not the Court. *Sheridan v. E.I. duPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3d Cir. 1996).

**B. Plaintiff Has Established a Prima Facie Case of Racial Discrimination**

Title VII of the Civil Rights Act of 1964 proscribes discrimination in employment on the basis of race, color, sex, religion and national origin. The substantive provisions of the Act make it unlawful to "[F]ail to refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C.* § 2000 (e)(1).

To prevail on a cause of action of racial discrimination at the workplace, the plaintiff is required to prove a prima facie case of discrimination by showing (i) membership in a protected class, (ii) possession of basic skills necessary for the job, (iii) an adverse employment action, and (iv) circumstances giving rise to an inference of race discrimination. *Slattery v. Swiss Reins. Am. Corp.,* 248 F.3d 87, 91 (2nd Cir. 2001). All of these elements are met by Harris-Lee, an African American woman, who was promoted up the corporate ladder at Sony-BMG and was complimented and respected by her supervisors.

Defendants' do not contest that Plaintiff, an African-American with an exemplary job history, fails to satisfy the first two elements of this standard. Defendants' Memorandum of Law at 15. As to the third and fourth elements, as further described below, the record is replete with evidence that would permit a rational fact finder to find in favor of Ms. Harris-Lee.

Discriminatory intent will rarely be demonstrated by "smoking gun" proof; rather, in most discrimination cases direct evidence of the employer's motivation is unavailable. *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1112 (2nd Cir. 1988). While there are many different ways to prove a discriminatory motive, the most common way of proving discrimination is to show that preferential treatment was given to employees outside the protected class. *Abdu Brinson v. Delta Airlines, Inc.*, 239 F.2d 456, 468 (2nd Cir. 2001). Another way to demonstrate unlawful motive is by showing that the employer responded to an employment situation in a manner that deviates from the ordinary policy of the employer. *Lander v. Hodel*, 197 U.S. Dist. LEXIS 11476 (D.C. Cir. 1986). As described below, the Plaintiff has ample proof that she was afforded less favorable treatment than were Sony-BMG employees not of African American descent. Also, Plaintiff has ample proof that Sony-BMG responded to the incident in a manner not corresponding to their own corporate policies by: 1) creating a hostile work environment that they forced Harris-Lee to work under and 2) constructively discharging Harris-Lee.

1. **Preferential Treatment of employees not of African-American Descent**

In this case, Sony-BMG's HR repeatedly ignored and/or failed to respond to any of the matters she brought to their attention, including but not limited to the following: Plaintiff's concerns of continuing to work with Warnock-Morgan, her repeated requests for an accommodation to be made, and her request to be provided with a copy of Defendant's investigative reports. *See, e.g.* Ex. RR-WW. Sony BMG's indifference to Plaintiff's plight

stands in marked contrast to their handling of other Sony-BMG employees not of African American Descent. When Caucasian employee comparators at Sony BMG had difficulties with their supervisors, including with Warnock-Morgan herself, they received comparatively better treatment than did Harris-Lee. Also, the treatment that Warnock-Morgan herself received indicates that Caucasians received comparatively better treatment in the aftermath of the incident than did Harris-Lee.

Stephanie Black is a Caucasian female who worked at Sony-BMG. She was initially assigned a position in which she had to report to Warnock-Morgan. She complained to HR that "she had difficulty working for [Warnock-Morgan] because [Warnock-Morgan] is a taskmaster. She's very demanding of her staff." Ex. MMM, *KK Transcript* at 45. After Ms. Black's complaints about her supervisor, she was transferred to another department. Ex. NNN, *Id.* Harris-Lee was refused a transfer to another department; on the contrary, she was forced to continue to work for the very supervisor who had assaulted her.

Crista Jones is a Caucasian female who worked at Sony-BMG. She was assigned a position in which she had to report to a supervisor named John Vernial. Ms. Jones had difficulties with her supervisor, just like Harris-Lee had difficulties with her supervisor, Warnock-Morgan. However, whereas Harris-Lee was forced to remain under the supervision of a supervisor who had assaulted her, Ms. Jones, a Caucasian female was offered an acceptable severance package when she left Sony-BMG. Ex. OOO, *KK Transcript* at 90.

Tanya Baria was a Sony-BMG employee not of African-American descent. She was the victim of a violent attack perpetrated against her by another Sony-BMG employee. An individual with the first name Rolando, working on the 29th floor was involved in an altercation with her. However, whereas the perpetrator of that attack was immediately fired by Sony-BMG,

Warnock-Morgan, who perpetrated a violent attack against Harris-Lee was permitted to keep her position. Ex. PPP, *PHL Transcript at 402-4.*

Warnock-Morgan violated numerous corporate policies as described in the Sony-BMG Policy Manual. Warnock-Morgan violated "Policy Number 25: Drug and Alcohol Use." Warnock-Morgan subjected herself to an in-vitro fertilization treatment cycle that was very trying, and which left her, by her own estimation, "emotionally raw." Ex. QQQ, *BWM Transcript* at 81. She has admitted that the regimen was causing her to exhibit a "werewolf condition that she can't control." Ex. RRR, *PHL Transcript* at 137. Policy Number 25 states "Sony-BMG prohibits the use or abuse of such [legal] drugs to the extent that an individual's job performance or fitness for duty is affected adversely." Warnock-Morgan herself admits that the process was making her feel unlike her normal self. Ex. SSS, *BWM Transcript* at 146. The Policy Manual states that "Employees in violation of the policy are subject to appropriate disciplinary action, up to and including suspension without pay and/or termination." Ex. TTT, *Policy Manual* at Policy Number 24. No such discipline was ever meted out to Warnock-Morgan, on the contrary she was subsequently promoted. Warnock-Morgan violated "Policy Number 24: Workplace violence." The policy states "acts or threats of physical violence, including intimidation, harassment, and/or coercion…will not be tolerated." Ex. UUU, *Policy Manual* at Policy Number 24. The policy neatly characterizes an assault like the one perpetrated by Warnock-Morgan on Harris-Lee as being completely unacceptable: "Threats or acts of physical or aggressive contact directed toward another individual." The policy makes clear that violating the policy "will lead to disciplinary and/or legal action, as appropriate." No such discipline was ever meted out to Warnock-Morgan, on the contrary, she was subsequently promoted.

In short, Plaintiff has supplied several comparator Caucasian employees at Sony-BMG who received treatment comparatively better than the manner in which Ms. Harris-Lee was treated. Caucasian peers were granted transfers or acceptable severance packages when they experienced tension with their supervisors; Harris-Lee received no such treatment. Harris-Lee's supervisor violated numerous policies but nary a punishment was meted out; Harris-Lee, on the other hand was victimized by a Sony-BMG superior, had her claim trivialized and ignored, and was denied transfers, severance, and rightful disability claims because of Sony-BMG's discriminatory actions and inactions.

## 2. Sony-BMG Subjected Ms. Harris-Lee to a Hostile Work Environment

Title VII proscribes employment discrimination on the basis of race, color, sex, religion and national origin. The substantive provisions of the Act make it unlawful to "[Retaliate] against any of [its] employees or applicants for employment… [for asserting their rights under the statute]." 42 U.S.C. § 2000 (e)-3(a). The Supreme Court has held that the text of Title VII permits a complainant to assert a cause of action for a hostile workplace upon racial discrimination. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 73 (1986). This is the case even though the terms "hostile work environment" do not appear directly in text of the Title VII provisions. *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 752 (1998). For a plaintiff to establish a hostile work place claim, she must establish that unlawful discrimination is so "sufficiently severe or pervasive [that it] alter[s] the conditions of [his or her] employment and create[s] an abusive working environment." *Meritor,* 477 U.S. at 67. In *Meritor,* Respondent brought action against Taylor and the bank, claiming that during her four (4) years at the bank she was constantly subjected to sexual harassment by Taylor in violation of Title VII. *Id.* at 60. It was determined that a hostile environment harassment violates Title VII, and the EEOC drew

upon a substantial body of judicial decisions and EEOC precedent holding that Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult. *Id.* at 65.

The showing of a hostile workplace involves both an objective and a subjective element: "the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Feingold v. New York State,* 366 F.3d 138, 150 (2nd Cir. 2004). After the incident between Harris-Lee and Warnock-Morgan, Sony BMG became a subjectively hostile working environment for Harris-Lee. Kelly acknowledges that HR was aware that Harris-Lee felt her relationship with Warnock Morgan had become "abusive." Ex VVV, *KK Transcript* at 52. Using the ruling from *Merritor*, the harassment of Harris-Lee by Warnock-Morgan was a Title VII violation and created a hostile working environment for Harris-Lee. *See* 477 U.S. at 68.

Whether an environment is hostile or abusive can be determined only by looking at all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating." *Forrest v. Jewish Guild for the Blind.* 3 N.Y.3d 295, 311 (1998). A hostile working environment exists when there is conduct that both altered the conditions of the victim's employment by being subjectively perceived as abusive by the plaintiff, and have created an objectively hostile or abusive environment-one that a reasonable person would find to be so. *Id.* The assault by Warnock-Morgan on Harris-Lee was clearly physically threatening. Harris-Lee sustained injuries trying to avert the assault, and Warnock-Morgan called to apologize to Harris-Lee for the assault. Ex. EE. A reasonable person would find it objectionable to continue working for a supervisor who perpetrated an assault against them. That Sony-BMG condoned maintaining a working relation wherein Warnock-Morgan

would remain Harris-Lee's supervisor subsequent to the attack makes them liable for creating a hostile working environment.

Harris-Lee's continued status as a report of Warnock-Morgan was clearly physically threatening to Harris-Lee, as Warnock-Morgan assaulted her. Moreover, Harris-Lee began closing her door at work because of her discomfort with her working environment, and HR was aware of the tension between Harris-Lee and Warnock-Morgan. Ex. WWW, *Transcript of KK* at 83. Yet no attempt was made to change the dynamic wherein Harris-Lee was reporting to a supervisor who had assaulted her. Incredibly, as Harris-Lee began to seek medical help for injuries she sustained during the attack, she was told to keep Warnock-Morgan abreast of these very appointments.

To recover against an employer for the discriminatory acts of its employee, the plaintiff must demonstrate that the employer became a party to such conduct by encouraging, condoning, or approving it. *Beharry v. Guzman*, 33 A.D.3d 742, 743 (2nd Dep't 2006). Sony-BMG played a large part in keeping the working environment hostile and not doing anything to improve it. HR initiated an investigation into the assault but didn't attempt to forge a resolution until more than two (2) weeks after the attack. During and after these meetings, Harris-Lee sought to be kept appraised of the status of the investigation; not only did Sony-BMG not keep her appraised, they didn't even have the decency to reply to any of the several emails she sent, in which she voiced concern about: Warnock-Morgan's retaliation, the way her colleagues were treating her, and her discomfort with the maintenance of a dynamic in which she was to report to Warnock-Morgan. Harris-Lee asked HR for her employee file, but the request was neither honored nor even responded to. Incredibly, Harris-Lee was told by HR that the company's uncertain economic stability prevented them from placing her in another department. Thus, she was forced to

continue to work in a hostile working environment. Ultimately, Sony BMG was not receptive to her situation, and by doing nothing, they condoned and approved the discriminatory acts of Warnock-Morgan.

### 3. Sony-BMG Constructively Discharged Ms. Harris-Lee

 "An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Terry v. Ashcroft,* 336 F.3d 128, 151 (2nd Cir. 2003). Case law generally focuses on two parts of this standard: the employer's intentional conduct and the intolerable level of the work conditions. *Petrosino v. Bell Atlantic,* 385 F.3d 210, 229 (2nd Cir. 2004).

For the intent requirement, the Second Circuit has recognized that in some constructive discharge cases, plaintiffs have been able to establish that employers acted with the specific intent to prompt employees' resignations. *Kirsch v. Fleet Street Ltd.,* 148 F.3d 149, 161-162 (2nd Cir. 1998). When these conditions exist, the mens rea requirement is easily established. *Petrosino,* 385 F.3d at 229.

It is not even necessary that the plaintiff show specific discriminatory intent on the part of the employer. *Whidbee v. Garzarelli Food Specialties*, *Inc.*, 223 F.3d 62, 74 (2nd Cir. 2000). In *Whidbee*, the court observed that if a plaintiff suing for constructive discharge cannot demonstrate specific intent, he must at least demonstrate that the employer's actions were "deliberate" and not merely "negligent or ineffective." *Id.*

In the instant case, Sony BMG acted deliberately to promote Harris-Lee's resignation. After Harris-Lee asked HR about hiring in other departments, she was told only about the instability of the company. Sony-BMG was not supportive of the plaintiff's needs. Sony-BMG was unresponsive to her emails and never got back to Harris-Lee about any opportunity to

transfer. Instead they left her to work for her boss who had assaulted her, creating an intolerable workplace. The intent underlying Sony-BMG's inactivity was to eventually get Harris-Lee to quit by leaving her in the hostile working environment. For the second prong, one must look whether the employer's deliberate actions rendered the employee's working condition so intolerable as to compel resignation. *Petrosino,* 385 F.3d at 230. This issue is assessed objectively to the standard of the reasonable person in that employee's position. *Id.*

In *Terry*, the defendants made it clear that a reasonable person would take the employers deliberate actions as making working conditions so intolerable that an employee would resign. *Terry,* 336 F.3d at 153. The defendants made comments that made it obvious that the plaintiff was not wanted as an employee, and summary judgment was not granted to the defendants on the issue of constructive discharge. *Id.*

In Harris-Lee's case she was forced to continue to work for someone who had previously assaulted her. Working for a boss known to have assaulted a report would be a difficult working environment for anyone, especially someone who was assaulted in the past, especially someone who was the very victim of the assault in question. Because Sony BMG did not accommodate Harris-Lee's request for transfer, Harris-Lee was left in an intolerable and unsafe working environment, which she would have to resign from eventually. Thus, Sony BMG constructively discharged the plaintiff.

## C. **Plaintiff Has Established Discriminatory Retaliation**

Title VII forbids employers from retaliating against employees who express opposition to discrimination or participate in anti-discrimination proceedings:

> It shall be an unlawful employment practice for an employer to discriminate against any [employee] … because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated

in any manner in an investigation, proceeding, or hearing under [Title VII]. 42 U.S.C. § 2000(e)(3).

A showing of retaliation entails three elements: (1) that the plaintiff participated in a statutorily protected activity known to her employer; (2) that the plaintiff suffered an actionable adverse action at the hands of her employer, and (3) that retaliation was a motivating factor in the employer's decision. *Treglia v. Manlius*, 313 F.3d 713, 719 (2nd Cir. 2002); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 223 (2nd Cir. 2001). As discussed below, the evidence unambiguously establishes all three elements, leaving a material issue of fact requiring presentation to the jury.

### a. **Ms. Harris-Lee Engaged in Protected Activity**

Harris-Lee engaged in protected activity when she reported that her white supervisor, Warnock-Morgan had assaulted her. There is ample case law to support the proposition that the Plaintiff need not formally file discrimination charges with the EEOC or state and local authorities to engage in protected activity; rather, opposing employer discrimination by private complaints to management can be sufficient. *See, e.g. Jennings v. Tinley Park School Dist. No. 146,* 796 F.2d 962 (7th Cir. 1986) (District court's implied factual finding of causal link between secretary's protected expression of making study of salaries of male custodians and women secretaries and termination of secretary, as required to establish retaliatory discharge under Title VII, was not clearly erroneous, in light of evidence that secretary gave supervisor a copy of salary study and that copy had secretary's signature on front); *Memmlo v. Commodore Business Mach., Inc.* 36 FEP 1140 (E.D. Pennsylvania 1984) (Female former employee who alleged that she was discharged for having criticized employer's hiring policy as being discriminatory against women has stated cause of action for retaliatory discharge, even though she had filed no formal complaint but rather related such criticisms to her supervisor in quasi-social setting, since context

22

in which criticism was made is not relevant to issue of retaliation).

In this case, Harris-Lee, an African-American, reported to HR an assault against her by her Caucasian supervisor. Harris-Lee worked in a department in which she was the only African-American. Harris-Lee reported to them that Warnock-Morgan was badgered by a Caucasian employee, Henzi, about a rumored departmental overhaul; he was not assaulted. She reported that another employee, Villardo, was asking Warnock questions about a rumored departmental overhaul; he was not assaulted. That Harris-Lee didn't explicitly state to HR that she was the victim of a racial attack should be no bar to recovery – Harris-Lee reasonably believed that she was the victim of a racial assault, and her layman's recitation of those facts should not now be held against her.

### b. Ms. Harris Suffered an Actionable Adverse Action

Harris-Lee suffered several actionable adverse actions because of her report of Warnock-Morgan's assault. First, her claims were trivialized to her when she was told by HR that the totality of the plan of action for Warnock-Morgan in the wake of her assaulting her African-American report was merely a nebulous advisory recommendation that Warnock-Morgan be nicer to Harris-Lee. Harris-Lee was advised that she was partly to blame for the attack because of her insubordination which not only caused her to be humiliated and stressed, but also sent a message to Sony-BMG African-American employees that their complaints not only would not be taken seriously, but would potentially lead to complaints being logged on their own employment files. Further, Harris-Lee was left to report to Warnock-Morgan, a situation that Harris-Lee reported being extremely uncomfortable with. Further, Plaintiff alleges that Sony-BMG played a role in the denial of Harris-Lee's disability requests.

While Plaintiff presents for the court actionable adverse actions, it also points out that

23

Federal and 2nd Circuit case law supports the proposition that the actionable adverse action standard is an issue of fact for the jury, rather than a question of law. *See Burlington Northern & Santa Fe Railway Co. v. White,* 126 S. Ct. 2405 (2006); *Kessler v. Westchester County Dept. of Social Services,* 461 F.3d 199 (2nd Cir. 2006).

### c.  Retaliation was a Motivating Factor

The Defendants' insist on dredging up a ten year old EEOC charge filed by Plaintiff against a predecessor-in-interest to Sony-BMG.  It speaks to their mindset in their handling the assault on Harris-Lee.  Harris-Lee has never asserted that she was retaliated against because she filed an EEOC charge in 1998.  She has however alleged that Warnock-Morgan was badgered by reports who were not African American without resorting to assaulting them, but assaulted Harris-Lee, who is African American.  She has also alleged that Sony-BMG failed to respond to an email where she notified Sony-BMG that Warnock-Morgan's post-assault treatment of Harris-Lee was retaliatory in nature.  They also kept Harris-Lee under the supervision of Warnock-Morgan after an assault that should rightfully have led to Warnock-Morgan's termination.  She also alleges that her rightful claims to disability insurance were sabotaged by Sony-BMG.

## D.  Plaintiff Has Offered Evidence of Slavery and Involuntary Servitude

The Supreme Court has held that involuntary servitude is a condition in which the victim is forced to work for someone by the use of threat of physical restraint or injury by the use of threat of coercion through law or legal process.  *U.S. v. Kozminski,* 487 U.S. 931 (1988). The term "serious harm" found in the language of 18 USCS § 1589 encompasses more than physical violence, including more subtle psychological methods of coercion. This statute was enacted to provide federal prosecutors with the tools to combat worker exploitation that does not rise to the

level of involuntary servitude as defined in *Kozminski. Id.; United States v. Marcus*, 538 F.3d 97, 100 (2d Cir. N.Y. 2008).

Not only was Harris-Lee subject to physical harm as defined in Kozminski when she was physically attacked by Warnock-Morgan, but she also suffered harm from the HR office of Sony-BMG. *See* 487 U.S. at 936.   According to 18 USCS § 1589 (c)(2), the term "serious harm" means any harm, "whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm."

In the instant case, Harris-Lee was under the threat of financial harm from Sony-BMG. The HR office was aware of the incident that occurred and knew that the working environment was not a safe one for Harris-Lee.   Instead of letting her transfer, Harris was told of the instability of Sony-BMG.  Her requests to be kept appraised of the HR investigation were met with silence and she was coerced to continue working in that department, or risk losing her job. Therefore, in order to keep her job and risk the financial harm of being unemployed, Harris-Lee was forced by Sony-BMG by nonphysical financial harm to continuing work in an environment where there was a threat of physical harm from Warnock-Morgan.

Dated: Carle Place, New York
          June 12, 2009

Respectfully submitted,
BORRELLI & ASSOCIATES, P.L.L.C.
*Attorneys for Plaintiff*
One Old Country Road, Suite 347
Carle Place, NY 11514
Tel. (516) 248 - 5550

By:  _____/s/_____

MICHAEL J. BORRELLI (MB 8533)