UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————x

PATRICIA HARRIS LEE,

       Plaintiff,

      -against-

SONY BMG MUSIC ENTERTAINMENT, INC.
and BARBARA WARNOCK-MORGAN,

       Defendants.

—————————————————————————x

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3|3|10
```

07 Civ. 6733 (CM)

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMahon, J.:

      Plaintiff Patricia Harris Lee ("plaintiff") filed this action against defendants Sony

BMG Music Entertainment, Inc. ("Sony") and her former supervisor, Barbara Warnock-

Morgan ("Warnock-Morgan") (collectively, "defendants"), alleging that they

discriminated and retaliated against her on the basis of her race following an altercation

with Warnock-Morgan, and also subjected her to a hostile work environment. Plaintiff

also alleges that defendants subjected her to a condition of involuntary servitude in

violation of the Thirteenth Amendment.

      On May 12, 2009, defendants moved for summary judgment pursuant to Federal

Rule of Civil Procedure 56. The motion is granted and the complaint is dismissed.

## BACKGROUND

The following facts are taken from defendants' Rule 56.1 Statement and plaintiff's Rule 56.1 Counter-Statement in Opposition to Defendants' Motion for Summary Judgment. There are numerous disputed issues of fact; however, they are not material to the determination of the motion.

**The Parties**

Plaintiff is an African-American female. She worked at Sony and its predecessor in New York City beginning in 1991, when she was hired as a Promotion Assistant. In 2005, plaintiff assumed the position of Associate Director of the Advertising Management Department. (Defs.' 56.1 Stmt. ¶¶ 1-2.) Plaintiff alleges in her Second Amended Complaint that she was never written up or disciplined formally, informally or otherwise. (2d Am. Compl. ¶ 19.) No such statement appears in her Rule 56.1 Statement.

Defendant Warnock-Morgan served as Senior Director of the Advertising Management Department at Sony at all relevant times. (Defs.' 56.1 Stmt. ¶ 3.) During the relevant time period, she was plaintiff's immediate supervisor.

Defendant Sony, plaintiff's employer at all relevant times, is a domestic corporation with its principal place of business in New York. Sony employs more than fifteen employees, and is an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 292(5), and the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8-102(5).

2

**Statement of Facts**

There is no evidence that plaintiff and Warnock-Morgan had a problematic working relationship prior to March 30, 2006.

On that day, plaintiff and Warnock-Morgan attended a departmental meeting with other members of the management staff. (Defs.' 56.1 Stmt. ¶¶ 5-6; Pl.'s Counter-Stmt. ¶ 6.) During the meeting the employees, who had heard rumors about a possible departmental merger, expressed concern over their employment security. (Defs.' 56.1 Stmt. ¶¶ 5-6; Pl.'s Ex. S (Dep. of Patricia Harris Lee, Feb. 3, 2009 ("Harris Lee Dep."), 76-78).) Warnock-Morgan responded by becoming hostile and yelling. (Defs.' 56.1 Stmt. ¶ 7; Pl.'s Counter-Stmt. ¶ 7.) The parties disagree about whether Warnock-Morgan yelled specifically at plaintiff—defendants say she did not—but for purposes of this motion I will accept the view of the facts most favorable to plaintiff and assume that she did. (Defs.' 56.1 Stmt. ¶¶ 7-8; Pl.'s Counter-Stmt. ¶¶ 7-8.) It is undisputed, however, that Warnock-Morgan did not utter any racial or other discriminatory remarks at or toward plaintiff before, during or after this meeting. (Defs.' 56.1 Stmt. ¶ 9; Pl.'s Counter-Stmt. ¶ 9.)

The next day, March 31, 2006, plaintiff and Warnock-Morgan exchanged words in Warnock-Morgan's office. (Defs.' 56.1 Stmt. ¶ 10; Pl.'s Counter-Stmt. ¶ 10.) According to plaintiff, Warnock-Morgan accused her of "orchestrating" the March 30, 2006 departmental meeting. (2d Am. Compl. ¶ 24; Pl.'s Ex. Y (Harris Lee Dep. 97-100).) According to defendants, plaintiff accused Warnock-Morgan of being a hypocrite, attacked her professional skills and told her that she took things too personally. (Defs.'

3

56.1 Stmt. ¶ 11.) Plaintiff denies the latter two accusations. (Pl.'s Counter-Stmt. ¶ 11.)
The dispute over who said what to whom is ultimately immaterial.

It is undisputed that Warnock-Morgan left her office after a heated exchange
between her and plaintiff. (Defs.' 56.1 Stmt. ¶ 12.) Defendants assert that plaintiff
followed Warnock-Morgan out of the office and down the hallway while the two hurled
insults at each other. (Id. ¶¶ 12-13; Pl.'s Counter-Stmt. ¶ 13.) Plaintiff claims she
remained in Warnock-Morgan's office for another minute or two and uttered no insults.
(Pl.'s Counter-Stmt. ¶ 13.) That dispute, too, is irrelevant. It is undisputed that plaintiff
left Warnock-Morgan's office at some point and that the parties ended up in some sort of
altercation out in the hallway. (Defs.' 56.1 Stmt. ¶ 13; Pl.'s Counter-Stmt.

¶ 13.) The parties disagree over what happened during the altercation: plaintiff asserts
that Warnock-Morgan charged aggressively at plaintiff and lunged at her while thrusting
her hands downward in an attempt to physically attack plaintiff (Pl.'s Counter-Stmt.
¶ 14), while defendants deny this and contend that Warnock-Morgan raised her hands
toward her own face while standing close to plaintiff, who then grabbed her supervisor's
hands (Defs.' 56.1 Stmt. ¶ 14). Plaintiff admits that she grabbed Warnock-Morgan's
hands, but says that she did so because she believed Warnock-Morgan was going to hit
her. (Defs.' 56.1 Stmt. ¶ 15; Pl.'s Counter-Stmt. ¶ 15.) There were no other
eyewitnesses to whatever happened. (Defs.' 56.1 Stmt. ¶ 16.) For purposes of this
motion, I will accept plaintiff's version of this event (which is far from undisputed) and
assume that Warnock-Morgan charged at plaintiff in a threatening manner, causing
plaintiff to grab her supervisor's hands in the belief that she was about to be hit by her
supervisor.

4

In her Second Amended Complaint, plaintiff asserted that Warnock-Morgan left a message on plaintiff's answering machine shortly after their altercation, asking for her forgiveness and blaming the incident on steroid medications she was taking. (2d Am. Compl. ¶ 27.) There is no mention of this in either party's Rule 56.1 statements. But Warnock-Morgan's deposition testimony, which is submitted as plaintiff's Exhibit EE, includes testimony that supports this allegation: Warnock-Morgan called to say she "was sorry that [she] had been so upset," "hadn't been feeling [her]self," was "obviously . . . emotional and . . . hoped [she] didn't scare" plaintiff. (Pl.'s Ex. EE (Dep. of Barbara Warnock-Morgan, Jan. 26, 2009 ("W-M Dep."), 146); Pl.'s Ex. ZZ (Dep. of Kathleen Kelley, Mar. 12, 2009 ("Kelley Dep."), 73).)

On April 3, 2006, plaintiff told Kathleen Kelley ("Kelley"), former Director of the Human Resources Department at Sony, about the incident with Warnock-Morgan. (Defs.' 56.1 Stmt. ¶ 20; Pl.'s Counter-Stmt. ¶ 20.) Plaintiff did not indicate during their conversation that she had suffered any injuries during the incident; neither did she complain that there was any racial overtone to the incident. But plaintiff told Kelley that she "no longer wanted to work with [Warnock-Morgan]." (Pl.'s Ex. AAA (Harris Lee Dep. 44).) While she did not specifically ask for a transfer or reassignment to another department, plaintiff did ask Kelley what was going on in other departments during their meeting on April 3. (Defs.' 56.1 Stmt. ¶¶ 21, 23; Pl.'s Counter-Stmt. ¶¶ 21, 23.) Kelley promised that she would "get back" to plaintiff after speaking with Warnock-Morgan's supervisor, Adam Owet ("Owet"). (Pl.'s Ex. AAA (Harris Lee Dep. 44).)

Kelley spoke to Owet on April 5, 2006. (Pl.'s Ex. B (Kelley Dep. 57).) Owet was leaving for vacation; he said that he would deal with the matter when he returned.

Owet returned on April 12 or 13, and he spoke to Warnock-Morgan on April 14; he reprimanded Warnock-Morgan and told her "this was never to happen again." (Pl.'s Ex. GGG (Kelley Dep. 59).)

Around this time, as Kelley was "doing [her] investigation" into the March 31 incident, she heard from other employees in the department that plaintiff and Warnock-Morgan were no longer speaking to each other, and that the employees did not want to approach plaintiff with questions because she was sitting in her office with the door closed. (Pl.'s Ex. III (Kelley Dep. 64-65).)

Kelley scheduled a meeting among herself, plaintiff, Warnock-Morgan and Daniel Alcock, who also appears to have worked in the Human Resources Department, to discuss the working relationship between plaintiff and her supervisor going forward. (Defs.' 56.1 Stmt. ¶ 24; Pl.'s Counter-Stmt. ¶ 24; Pl.'s Ex. DD (W-M Dep. 135).) That meeting took place on April 17, 2006, after Warnock-Morgan was reprimanded. Kelley believed the meeting was necessary in order to "try to clear the air between the two and see if we could come to a workable situation." (Pl.'s Ex. HHH (Kelley Dep. 64).) During the meeting, plaintiff recounted her side of the incident, and Warnock-Morgan did the same. (Pl.'s Ex. KKK (Kelley Dep. 82).) At the end of the meeting, Kelley told plaintiff that "she needed to . . . at least be able to communicate" with other employees on work issues and projects. (Pl.'s Ex. EEE (Kelley Dep. 66).) Kelley also told plaintiff to give Warnock-Morgan some notice when she left the office to seek medical help for her injuries resulting from the incident, and told Warnock-Morgan to give plaintiff the freedom to go to her doctors' appointments. (Pl.'s Ex. D (Kelley Dep. 67).)

6

The record reveals that plaintiff and Kelley left the meeting with rather different attitudes. Kelley thought that plaintiff and Warnock-Morgan were going to try to "work through it" and have a "professional working relationship" with each other. (Id.) Plaintiff, for her part, assumed that Kelley would conclude that Harris could no longer work with Warnock-Morgan. (Pl.'s Counter-Stmt. ¶ 26.) Just two days after the meeting, on April 19, 2006, plaintiff emailed Kelley, to say that she had "become even more uncomfortable with our current situation," and to ask for recommendations on how to "salvage the situation." (Pl.'s Ex. VV (Harris Lee Email to Kelley, Apr. 19, 2006).) Plaintiff emailed Kelley again on April 28, 2006. (Pl.'s Ex. WW (Harris Lee Email to Kelley, Apr. 28, 2006).) Her emails went unanswered. (Defs.' 56.1 Stmt. ¶ 25; Pl.'s Counter-Stmt. ¶ 25.)

Plaintiff "left the ultimate plan of action up to HR" (id. ¶ 26), and Kelley saw no reason to separate plaintiff from Warnock-Morgan. Kelley knew that plaintiff was not happy about her situation; in fact, according to plaintiff's Second Amended Complaint, Kelley "[a]t one point . . . told plaintiff that she needed to endure through her work assignments," though this is not mentioned in the Rule 56.1 statements. (2d Am. Compl. ¶ 36.) But there was no new confrontation between plaintiff and Warnock-Morgan; in fact, there is not a scintilla of evidence that Warnock-Morgan did anything out of line after the incident on March 31, 2006. Plaintiff suffered no diminution in her wages, position or job responsibilities following the incident with Warnock-Morgan. (Defs.' 56.1 Stmt. ¶ 30).

Although nothing untoward occurred after March 31, plaintiff nonetheless feared for her safety and well-being. (2d Am. Compl. ¶ 37.) On May 30, 2006, she took a

7

medical leave of absence because she was "suffering terrible pain" after the incident with Warnock-Morgan. (Pl.'s Counter-Stmt. ¶ 29). Plaintiff never returned from her medical leave. (Defs.' 56.1 Stmt. ¶ 31.) Sony applied plaintiff's sick, vacation and personal days to keep her on payroll until July 10, 2006, when all her compensable absences were exhausted. (Id. ¶ 33.) At that time, plaintiff contends that she was constructively discharged. (Pl.'s Counter-Stmt. ¶¶ 30-31, 36.)

In none of her conversations or emails with Sony's Human Resources Department about Warnock-Morgan did plaintiff complain about racial discrimination (or discrimination on any ground). (Defs.' 56.1 Stmt. ¶ 27; Pl.'s Counter-Stmt. ¶ 27.) Plaintiff does not know of any Sony employee who was discriminated against on the basis of race. (Defs.' 56.1 Stmt. ¶ 36.) However, it is her "belief" that her race was a factor in the "sensitivity level of the people in Human Resources' decision to ignore what happened between herself and Warnock-Morgan." (Defs.' Ex. Z (Harris Lee Dep. 35-37, 226).)

Plaintiff claims that she sustained "back, neck and psychological injuries" (Defs.' 56.1 Stmt. ¶ 29; Pl.'s Counter-Stmt. ¶ 29) as a result of the altercation with Warnock-Morgan, although on the view of the facts most favorable to plaintiff, the only physical touching during the altercation occurred when plaintiff grabbed her supervisor's hands (Defs.' 56.1 Stmt. ¶ 15; Pl.'s Counter-Stmt. ¶ 15). Plaintiff also claims that she suffers from Severe Reactive Anxiety Disorder, Post Traumatic Stress Disorder and Depression, resulting from the emotional stress of having to continue working with Warnock-Morgan after their altercation. (2d Am. Compl. ¶¶ 38, 46; Pl.'s Counter-Stmt. ¶ 30).

8

## Procedural History

On July 26, 2007, plaintiff filed the original complaint in this action. On November 30, 2007, plaintiff filed an amended complaint against defendants, alleging discrimination and retaliation based on disability, race and/or national origin, hostile work environment and intentional infliction of emotional distress.

Defendants moved to dismiss the amended complaint. The Court dismissed the Title VII and Americans with Disabilities Act ("ADA") claims against Warnock-Morgan with prejudice, because she was not plaintiff's "employer" for purposes of the federal anti-discrimination statutes. The Court denied defendants' motion to dismiss plaintiff's claims of hostile work environment and race discrimination; granted the motion to dismiss with prejudice her claims of discrimination based on national origin and intentional infliction of emotional distress; and granted the motion to dismiss her claims of discrimination on the basis of disability and retaliation without prejudice. Lee v. SONY BMG Music Entm't, Inc., 557 F. Supp. 2d 418 (S.D.N.Y. 2008).

On May 30, 2008, plaintiff filed the Second Amended Complaint, alleging that defendants: (i) discriminated and retaliated against plaintiff on account of her disability in violation of the ADA, NYSHRL and NYCHRL; and (ii) discriminated and retaliated against plaintiff on account of her race and subjected her to a hostile work environment in violation of Title VII, § 1981, NYSHRL and NYCHRL. However, the new pleading did not solve the deficiencies of the old one, so when defendants moved to dismiss the new complaint, the Court granted the motion to dismiss plaintiff's repleaded disability discrimination and retaliation claims with prejudice. Lee v. SONY BMG Music Entm't, Inc., No. 07 Civ. 6733, 2008 WL 4787523 (S.D.N.Y. Oct. 30, 2008).

9

This left for adjudication claims of race discrimination, hostile work environment on the basis of race, and retaliation.

## DISCUSSION

**A.      Standard of Review**

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor."  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  Whether any disputed issue of fact exists is for the court to determine.  Balderman v. U.S. Veterans Admin., 870 F.2d 57, 60 (2d Cir. 1989).  The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact.  Celotex v. Catrett, 477 U.S. 317, 323 (1986).  Once such a showing has been made, the non-moving party must present  "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation."  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

Moreover, not every disputed factual issue is material in light of the substantive law that governs the case.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment."  Anderson, 477 U.S. at 248.

10

Finally, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the non-movant.

**B.     Applicable Legal Standards for Plaintiff's Discrimination Claims**

### 1.     Race Discrimination

Claims of employment discrimination under Title VII are analyzed pursuant to the tripartite burden-shifting framework established in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). The burden initially falls upon the plaintiff to establish a prima facie case of racial discrimination in the terms and conditions of employment. To do so, plaintiff must show that: (1) she belongs to a protected class; (2) she was performing her duties satisfactorily; (3) she was subject to an adverse employment action; and (4) the action occurred in circumstances giving rise to an inference of discrimination based on plaintiff's membership in that class. See Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008); McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

Courts have repeatedly noted that claims brought under NYSHRL and NYCHRL are analytically identical to claims brought under Title VII. See Ferraro v. Kellwood Co., 440 F.3d 96, 99 (2d Cir. 2006); Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 (2d Cir. 2000) ("Our consideration of claims brought under the state and city human rights laws parallels the analysis used in Title VII claims."); Torres v. Pisano, 116 F.3d 625, 629 (2d Cir. 1997). Therefore, this Court will analyze plaintiff's federal, state and city race discrimination, retaliation and hostile work environment claims together.

11

## 2. Hostile Work Environment

To survive a summary judgment motion on a hostile work environment claim, plaintiff must introduce evidence showing that her "workplace was permeated with discriminatory intimidation, ridicule, and insult," which was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quotation marks and citations omitted). Courts must look to the totality of the circumstances to determine whether an environment is "hostile" or "abusive," and should consider the following nonexclusive list of factors: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's "work performance." Id. at 23. Plaintiff's evidence, if any, must show that the conduct at issue created an environment that is both objectively and subjectively hostile. See Richardson v. N.Y. State Dep't of Corr. Servs., 180 F.3d 426, 436 (2d Cir. 1999).

However, as Justice Scalia famously reminds us, Title VII is not a "general civility code" for the workplace. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998). A hostile work environment claim is actionable only as a form of prohibited discrimination, with the hostile work environment being the adverse employment action to which the plaintiff is subjected on account of race, gender, religion or national origin. Even when a plaintiff establishes that she was exposed to a work environment that was both objectively and subjectively hostile, "mistreatment at work . . . through subjection to a hostile environment . . . is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic." Brown v. Henderson, 257

12

F.3d 246, 252 (2d Cir. 2001); see also Oncale, 523 U.S. at 79-80; Jessamy v. City of New

Rochelle, 292 F. Supp. 2d 498, 512 (S.D.N.Y. 2003) ("[T]he absence of such conduct [of

any overtly racial character] is a factual omission that is necessarily fatal to a race-based

hostile work environment claim.").

## C.    Defendants' Motion for Summary Judgment Dismissing Plaintiff's Race Discrimination Claims (Including Her Claim of Hostile Work Environment) Must Be Granted, Because Plaintiff Has Not Raised a Genuine Issue of Material Fact That She Suffered Any Adverse Employment Action

Defendants do not contest that plaintiff has established the first two elements of

her prima facie case: she is a member of a protected class (she is African American) and

she was qualified for her position. Rather, they contend that she fails to adduce any

evidence of either adverse employment action or of action taken because of her race. It is

necessary to address only the first argument, because defendants are correct: plaintiff has

not adduced any evidence that she was subjected to an adverse employment action to

support either her claim of race discrimination or her claim of hostile work environment.

To establish that she was subject to an adverse employment action, plaintiff must

show that she "suffered a materially adverse change in the terms and conditions of

employment." Torres, 116 F.3d at 640 (internal citations omitted). Some examples of a

materially adverse change include "termination of employment, a demotion evidenced by

a decrease in wage or salary, a less distinguished title, a material loss of benefits,

significantly diminished material responsibilities, or other indices . . . unique to a

particular situation." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003). While the

adverse change may not entail economic loss, there must be a link between the

13

discrimination and some "tangible job benefits" such as "compensation, terms, conditions or privileges" of employment. Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002).

Plaintiff argues that Sony's failure to separate her from Warnock-Morgan after their altercation (i) subjected her to a hostile work environment, which eventually (ii) forced her to resign involuntarily. Both hostile work environment and constructive discharge qualify as adverse employment actions under Title VII. See, e.g., Penn. State Police v. Suders, 542 U.S. 129, 143 (2004); Fitzgerald v. Henderson, 251 F.3d 345, 357 (2d Cir. 2001). But neither claim is easy to prove, and in this case there is no evidence from which a reasonable juror could conclude that plaintiff was either subjected to a hostile work environment or was forced to resign.

## 1. Hostile Work Environment as Adverse Employment Action

First, plaintiff fails to raise a genuine issue of fact on the issue of hostile work environment. There is no evidence that would support an inference that the workplace at Sony was "permeated" with hostility directed toward plaintiff on *any* ground, much less on a prohibited ground. There was a single incident between plaintiff and Warnock-Morgan. It is true that a single instance of harassment can, if "extraordinarily severe," create a hostile work environment, Howley v. Town of Stratford, 217 F.3d 141, 153 (2d Cir. 2000), but the types of incidents that have been held to be sufficiently severe are things like a forcible sexual attack, see Ferris v. Delta Air Lines, Inc., 277 F.3d 128, 136 (2d Cir. 2001). In this Circuit, a single incident cannot create a hostile work environment unless it creates an "intolerable alteration" of the plaintiff's working conditions, Howley, 217 F. 3d at 154, so as to substantially interfere with or impair her ability to do her job, Mormol v. Costco Wholesale Corp., 364 F.3d 54, 59 (2d Cir. 2004).

14

The altercation between plaintiff and her supervisor was both unfortunate and inexcusable. But it is less serious than single incidents that have been held not to constitute "adverse employment actions." Most recently, in Mathirampuzha v. Potter, 548 F.3d 70 (2d Cir. 2008), the Second Circuit affirmed an order summarily dismissing a claim of national origin discrimination. In that case, the plaintiff alleged that his supervisor grabbed his arm, punched him in the shoulder and chest, poked his eye and spit in his face. Id. at 73. After this incident, plaintiff suffered chest pains, contusions to his shoulder blade, required eye surgery and fell into a depression. Id. Nonetheless, the court determined that plaintiff had not established a prima facie case of national origin discrimination, because he had failed to offer any evidence that he suffered any adverse employment action. "The physical encounter itself, while understandably upsetting, was not so severe as to alter materially the plaintiff's working conditions . . . . Although a more severe incident of harassment or abuse could constitute an adverse employment action, the brief incident . . . however regrettable, does not meet the 'extraordinarily severe' standard." Id. at 79. Put otherwise, the Circuit concluded that the incident described did not work any adverse change in the terms and conditions of Mr. Mathirampuzha's employment. See id. (citing Sanders v. N.Y. City Human Res. Admin., 36 F.3d 749, 755 (2d Cir. 2004)).

If the incident in Mathirampuzha was not severe enough to change the plaintiff's working conditions for the worse, then no rational trier of fact could conclude that the altercation between plaintiff and Warnock-Morgan altered this plaintiff's working conditions for the worse, which is the touchstone of an adverse employment action. Assuming the incident occurred as plaintiff described it, there was less physical contact

between plaintiff and Warnock-Morgan and plaintiff suffered nothing like the physical injury inflicted by the supervisor in Mathirampuzha—injury that required surgical repair. Furthermore, Warnock-Morgan apologized to plaintiff almost immediately, and the incident was addressed by Sony management, which reprimanded plaintiff's supervisor and directed that it not be repeated.

The fact that management did not deal with the incident in the way that plaintiff preferred—by separating her from Warnock-Morgan—also does not make her work environment "hostile" as required by law. Title VII confers on a plaintiff no right to choose the remedy to end the harassment, see Gonzalez v. Beth Israel Med. Ctr., 262 F. Supp. 2d 342, 355-56 (S.D.N.Y. 2003); Wahlstrom v. Metro-North Commuter R.R. Co., 89 F. Supp. 2d 506 (S.D.N.Y. 2000), or demand that a workplace dispute be resolved in the way that is most attractive to her, McCardle v. Arms Acres, Inc., No. 03 Civ. 05721, 2009 WL 755287, at *8 n.8 (S.D.N.Y. Mar. 23, 2009). Title VII only requires that the employer's remedy be reasonably calculated to eliminate the hostile work environment. See Murray v. NYU Coll. of Dentistry, 57 F.3d 243, 250 (2d. Cir. 1995); Snell v. Suffolk County, 782 F.2d 1094, 1103-04 (2d Cir.1986). Even a "mere written warning can be an appropriate response if it conveys the message that further harassment will not be tolerated." Wahlstrom, 89 F. Supp. 2d at 526.

Furthermore, while plaintiff's reaction to her situation arguably interfered with her work performance, nothing in the record suggests that she was either attacked or not transferred *because of her race*. At her deposition, plaintiff testified that the only basis for her belief that Sony failed to act based on her race is that "Barbara [Warnock-Morgan] is Caucasian, Kathleen [Kelley] is Caucasian and so is Dan Alcock." (Defs.'

16

Ex. Z (Harris Lee Dep. 35-37, 226).) That fact, in and of itself, is insufficient to support an inference of discrimination. See Carter v. New Venture Gear, Inc., No. 00 Civ. 1744, 2007 WL 2847217, at \*7 (N.D.N.Y. Sept. 26, 2007), aff'd, 310 F. App'x 454, 457 (2d Cir. 2009); Barriera v. Bankers Trust, No. 98 Civ. 3641, 2003 WL 22387099, at \*6 (S.D.N.Y. Oct. 20, 2003); Hawana v. City of N.Y., 230 F. Supp. 2d 518, 527-28 (S.D.N.Y. 2002); Richardson v. Newburgh Enlarged City Sch. Dist., 984 F. Supp. 735, 744 (S.D.N.Y. 1997). Plaintiff's "feelings and perceptions of being discriminated against are not evidence of discrimination." Bickerstaff v. Vassar Coll., 196 F.3d 435, 456 (2d Cir. 1999) (internal quotations omitted).

Finally, while discriminatory behavior or comments need not be directed at plaintiff to create a race-based hostile work environment, see Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000), there is absolutely no evidence of any such behavior at Sony in the record before me, and plaintiff testified that she was not aware of any Sony employee who had been the victim of race discrimination.

## 2. Constructive Discharge as Adverse Employment Action

Plaintiff has also not raised a genuine issue of fact concerning her claim of constructive discharge.

A plaintiff alleging constructive discharge must establish that her employer "intentionally create[d] a work atmosphere so intolerable that [she was] forced to quit involuntarily." Petrosino v. Bell Atl., 385 F.3d 210, 229 (2d Cir. 2004) (quoting Terry v. Ashcroft, 336 F.3d 128, 151-52 (2d Cir. 2003)); Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996). Plaintiff need not demonstrate specific intent to fulfill the

17

intent requirement, see, e.g., Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 74 (2d Cir. 2000), but if a plaintiff cannot show specific intent, "he or she must at least demonstrate that the employer's actions were 'deliberate' and not merely 'negligent or ineffective,'" Petrosino, 385 F.3d at 229-30 (quoting Whidbee, 223 F.3d at 74). Moreover, these deliberate acts must have been taken for the purpose of forcing plaintiff to resign. See Kader v. Paper Software, Inc., 111 F.3d 337, 339 (2d Cir. 1997); Spence v. Maryland Cas. Co., 995 F.3d 1147, 1157 (2d Cir. 1993).

The intolerability of an employee's work conditions is evaluated "objectively by reference to a reasonable person in the employee's position." Petrosino, 385 F.3d at 230. An "employee's subjective assessment of working conditions as 'intolerable' is insufficient." Ongsiako v. City of N.Y., 199 F. Supp. 2d 180, 187 (S.D.N.Y. 2002) (citing Neale v. Dillon, 534 F. Supp. 1381, 1390 (E.D.N.Y. 1982), aff'd without op., 714 F.2d 116 (2d Cir. 1982)).

For the same reason that the March 31 incident did not alter plaintiff's working conditions enough to create a hostile work environment, it cannot support a finding that plaintiff's employment conditions thereby became "intolerable." If plaintiff's working conditions were not materially altered by the incident, she cannot possibly have been forced out of her job.

From the perspective of a reasonable person, the brief altercation between plaintiff and Warnock-Morgan is plainly insufficient to justify an inference that plaintiff was constructively discharged. In Carlucci v. Kalsched, 78 F. Supp. 2d 246, 251, 255 (S.D.N.Y. 2000), the court dismissed a similar constructive discharge claim on the ground that no adverse employment action had been proved where an employer got

18

"really angry very quickly" and "flailed his arms around" in response to a question the employee asked. The incident caused employee Carlucci to "get 'really scared' and experience heart palpitations"; she contended that she was physically unable to return to work as a result. Id. at 251. The court ruled that "as a matter of law, the single incident of arm-waving . . . does not rise to the level of intolerable conditions that were so difficult or unpleasant that a 'reasonable person . . . would have felt compelled to resign.'" Id. at 256.

Sony's refusal to accommodate plaintiff's request for a transfer also does not rise to the level needed to support a claim for constructive discharge, for two reasons.

First, no reasonable person could have thought that continuing to report to Warnock-Morgan after the single incident plaintiff describes was "intolerable" to the degree required by Second Circuit precedents on constructive discharge. Warnock-Morgan recognized that her behavior was inappropriate and apologized to plaintiff even before she was reprimanded. And there is no evidence that the supervisor ever behaved badly toward plaintiff again, or that plaintiff was subjected to any other instance of harassing or intimidating behavior.

Second, there is absolutely no evidence that Kelley, or anyone else at Sony, refused to assign plaintiff to a different department as a ruse to force her to quit. It is true that Kelley did not respond to the emails plaintiff sent her after the April 17, 2006 meeting—including an email dated April 19, 2006, in which plaintiff said that she had "become even more uncomfortable with our current situation" and asked for recommendations on how to "salvage the situation." (Pl.'s Ex. VV (Harris Lee Email to Kelley, Apr. 19, 2006).) However, a lack of concern, effectiveness or attentiveness in

19

dealing with plaintiff's situation does not support an inference that Sony deliberately compelled plaintiff to resign. See Whidbee, 223 F.3d at 74. In Whidbee, the Second Circuit affirmed so much of this Court's grant of summary judgment as dismissed a claim of constructive discharge where a manager responded to the plaintiffs' complaints about a co-worker's harassment by saying that he did not know how to deal with the problem and it was "just too much" for him. Id. at 67. The Circuit ruled that, "as ineffective or even incompetent" as the manager's conduct may have been, "it does not rise to the level of deliberate action [taken for the purpose of forcing plaintiff to resign] required by our precedent." Id. at 74.

Here, Kelley was far more attentive to plaintiff's concerns than was the "incompetent" manager in Whidbee. She listened to plaintiff's complaint; contacted Warnock-Morgan's supervisor, who reprimanded Warnock-Morgan; and then convened a meeting to address the working relationship between plaintiff and her supervisor. And she agreed to "check-in and see how things were progressing," "be in touch" and "follow up with next steps." (Pl.'s Ex. WWW (Kelley Dep. 83).) Far from demonstrating that Sony wanted plaintiff to resign, these supervisory actions suggest that the company wished to retain plaintiff as an employee—a circumstance that compels dismissal of a claim of constructive discharge. See Pena v. Brattleboro Retreat, 702 F.2d 322, 325 (2d Cir. 1983). Sony did not deal with the situation in the way plaintiff wanted, but "constructive discharge cannot be proven merely by evidence that an employee . . . preferred not to continue working for that employer," Spence, 995 F.2d at 1156, or was dissatisfied with work assignments, see DeSalvo v. Volhard, No. 02 Civ. 1148, 2007 WL

2874460, at *1 (N.D.N.Y. Sept. 27, 2007), aff'd, 312 F. App'x 394 (2d Cir. 2009);

Stetson v. NYNEX Service, Co., 995 F.2d 355, 360 (2d Cir. 1993).

\* \* \* \* \* \*

Because there is no evidence supporting plaintiff's contention that she suffered either of the two types of adverse employment action she identifies, her claim of race discrimination and race discrimination by virtue of hostile work environment must be dismissed.

**D. Plaintiff's Claim of Retaliation Must Be Dismissed**

Finally, plaintiff argues that she was retaliated against for complaining about her supervisor, Warnock-Morgan.

Retaliation claims, like discrimination claims, are subject to the McDonnell-Douglas burden-shifting analysis. See Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 94 (2d Cir. 2001). To establish a prima facie case of retaliation, an employee must show "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." Richardson v. Comm'n on Human Rights & Opportunities, 532 F.3d 114, 123 (2d Cir. 2008) (internal quotation marks omitted); Feingold v. New York, 366 F.3d 138, 156 (2d Cir. 2004). Here, plaintiff raises no issue of fact as to the first element of a prima facie case.

Reporting that a supervisor attacked her is a protected activity under Title VII only if the report can be fairly understood as asserting a claim of prohibited discrimination. A complaint cannot be the basis for a Title VII retaliation claim if plaintiff's complaints to management could not be understood to have been about race.

21

As the Second Circuit has held, "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998); see also Malaney v. Elal Israel Airlines, No. 07 Civ. 8773, 2008 WL 126642, at *6 (S.D.N.Y. Jan. 4, 2008), aff'd, 331 F. App'x 772, 775 (2d Cir. 2009); McDowell v. T-Mobile USA, Inc., No. 04 Civ. 2909, 2007 WL 2816194, at *18 (E.D.N.Y. Sept. 26, 2007), aff'd, 307 F. App'x 531, 534 (2d Cir. 2009).

In this case, there is no evidence whatsoever that plaintiff ever suggested to anyone at Sony that she was complaining about race discrimination. Plaintiff's subjective belief that Warnock-Morgan attacked her because of her race—a belief supported by nothing more substantial than the fact that plaintiff is African-American and Warnock-Morgan is Caucasian—was never expressed to Kelley or anyone in Sony management. Sony cannot be charged with knowing about an instance of discrimination if it was never told that there was any racial aspect to the situation. The record contains no evidence that Warnock-Morgan ever uttered any racial remarks, whether to plaintiff or to anyone else, or took any adverse action against other African-American employees, or did anything at all that was tinged with racism; and there is no evidence that management had ever received any complaint or information tending to suggest that Warnock-Morgan harbored any racial bias. If Warnock-Morgan had ever engaged in such behavior, and that was known to management, plaintiff might argue that management should have inferred that discrimination was the basis of plaintiff's complaint. But the mere fact that the two employees involved in an incident were of different races does not give rise to an

22

inference of racism, and that is all plaintiff has. Plaintiff did testify that an employee at
Sony named Marcella believed Warnock-Morgan to be a racist. (Pl.'s Ex. N (Harris Lee
Dep. 411-12).) But this hearsay statement is not admissible to prove that the supervisor
was in fact a racist, and only admissible evidence can raise a genuine issue of material
fact. Furthermore, even if plaintiff's testimony were admissible for the truth of the matter
asserted, she offers no evidence that Kelley or anyone in Sony management had received
a complaint from Marcella or otherwise knew that a lower-level employee thought her
supervisor harbored racial bias.

In short, plaintiff fails to raise a genuine issue of fact on her claim of retaliation,
because there is no evidence of either racially discriminatory behavior or management's
knowledge about the same. It is thus not necessary to grapple with the more difficult
issue of whether a "reasonable" employee might have been dissuaded from complaining
if she had known that she would not be transferred after she made the complaint. See
Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64, 67-68 (2006); Hicks v.
Baines, 593 F.3d 159, 165 (2d Cir. 2010) ("[A]nti-discrimination and anti-retaliation
provisions 'are not coterminous'; anti-retaliation protection is broader and 'extends
beyond workplace-related or employment-related retaliatory acts and harm.'").

## E.     Plaintiff's Involuntary Servitude Claim Must Be Dismissed

There is no evidence before this Court to support plaintiff's claim against Sony
and Warnock-Morgan of involuntary servitude, in violation of the Thirteenth
Amendment—the amendment that abolished slavery after the Civil War.

Involuntary servitude means "a condition of servitude in which the victim is
forced to work for the defendant by the use or threat of physical restraint or physical

23

injury, or by the use or threat of coercion through law or the legal process." United
States v. Kozminski, 487 U.S. 931, 952 (1988). Plaintiff was not subject to any physical
or legal threats to continue working for Sony. She does not suggest that defendants used
physical or legal threats in order to force her to continue working at Sony. In fact,
plaintiff argues constructive discharge based on her involuntary resignation, which
requires a showing that the employer compelled plaintiff to resign. She cannot argue
constructive discharge and then contend that she was forced to continue working for
Sony.

What plaintiff really means is that she felt she had to continue working at Sony,
despite the fact that Warnock-Morgan continued to be her supervisor, because she would
have suffered financially if she lost her job. That is not "involuntary servitude."

**F.     Plaintiff's Claim Against Warnock-Morgan Must be Dismissed**

Plaintiff has claimed that Warnock-Morgan aided and abetted the racially
discriminatory practices of Sony, in violation of NYSHRL. However, since this Court
has concluded that plaintiff's claims against Sony must be dismissed for failure to raise
any genuine issue of material fact, the derivative claim against Warnock-Morgan also
fails.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment is granted. This
constitutes the decision and order of this Court. The Clerk of the Court is directed to
remove the motion for summary judgment (Docket No. 54) from the Court's outstanding
motion list, and to close the case.

24

Dated: March 3, 2010

_____
U.S.D.J

BY ECF TO ALL PARTIES